SERVICE EMPLOYEES INTERNATIONAL LOCAL UNION NO. 316, Petitioner, v. THE ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Respondents.

Fourth District No. 4—86—0433

Opinion filed March 12, 1987.

Petition for review of order of Illinois Educational Labor Relations Board.

Stephen M. Tillery and Kevin C. Kaufhold, both of Kassly, Bone, Becker, Dix, Tillery & Reagan, P.C., of Belleville, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, Imelda R. Terrazino, Assistant Attorney General, and Randi C. Hammer, of Illinois Educational Labor Relations Board, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

Andrea R. Waintroob and Charles P. Rose, both of Vedder, Price, Kaufman & Kamholz, of Chicago, for respondent Carbondale Community High School District No. 165.

JUSTICE McCULLOUGH delivered the opinion of the court:

The board of education of the Carbondale Community High School District No. 165 (District) hired an independent contractor to perform its custodial and maintenance work. It, then, terminated the employment of its custodial and maintenance staff. The Service Employees International Local Union No. 316 (SEIU), which represented the custodial and maintenance staff, brought an unfair labor practice charge against the District (Ill. Rev. Stat. 1985, ch. 48, pars. 1714(a)(1),

(a)(5)). The hearing officer found that the District had violated sections 14(a)(1) and (a)(5) of the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1985, ch. 48, pars. 1714(a)(1), (a)(5)). The Illinois Educational Labor Relations Board (Board) supplemented the hearing officer's findings of fact, rejected the standard of review which she used, and found the District had not committed any unfair labor practice. SEIU appeals, arguing the Board's decision is contrary to the law and not supported by the manifest weight of the evidence.

The genesis of this action is a decision by the District to subcontract its custodial and maintenance services for the high schools. SEIU alleged that the District had failed to bargain in good faith about its decision to subcontract the custodial and maintenance work and that the decision to subcontract was motivated by antiunion animus.

SEIU had represented the custodial and maintenance employees for several years, and the parties had entered into a series of collective-bargaining agreements. Bill Schwegman, a member of the board of education, testified that prior to the current difficulty, the District and SEIU had been on friendly terms. The last collective-bargaining agreement was a two-year agreement which expired on June 30, 1984. This agreement pertained to 10 custodial and 2 maintenance employees.

Members of the board of education for the District testified that the District was in financial difficulty and had experienced budget deficits prior to the 1983-84 school year. At the February 1984 meeting, independent contracting was discussed as a potential cost-cutting method. Don Yost, the business manager for the District, was authorized to investigate savings methods and report back. Yost later circulated a memo, delineating potential cost savings, and eventually the board of education authorized the letting of bids. The decision to subcontract was not based on antiunion sentiment and cost was the overriding factor. Although each member testified about the precise sequence of events, their testimonies were consistent with Yost's testimony and records which were submitted.

Yost testified that he had been the business manager for the District for several years. The topic of subcontracting, independent contracting for custodial and maintenance work, to save money originally arose four to five years prior to the 1983-84 school year. In the fall of 1983, a $177,000 budget deficit occurred. The superintendent asked Yost to look into methods of dealing with the economic problems. The projected costs for custodial and maintenance work by SEIU employees were $243,000 for custodial work and $40,000 for maintenance

work. On February 20, 1984, at the regular board meeting, Yost was directed to obtain information on the advantages and disadvantages of independent contracting for custodial services.

He did so and submitted a report of his findings in March 1984. He and the board of education members discussed the findings. Yost stated that the sole reason for contracting out services was economic. He estimated a $22,000 savings by subcontracting custodial work. After March 30, 1984, in an executive session, the board of education instructed Yost to prepare bid specifications. He did so, using other districts' bids as a pattern.

Elmer Brandhorst, business manager for SEIU, stated that in late March or early April 1984, Yost told him informally that the District was considering contracting out services. On April 17, 1984, SEIU sent a letter to the District requesting that it meet to negotiate the contract for the 1983-84 school year.

On May 11, 1984, Yost, Brandhorst, and other representatives met to discuss collective bargaining. The meeting lasted approximately 15 minutes. The District acknowledged receipt of the bargaining request. After the meeting, Brandhorst stated that Yost again told him about the possibility of hiring an independent contractor to perform custodial services. Brandhorst told Yost that the union was in negotiation for a new contract and would like to continue.

Brandhorst further testified that between May 11, 1984, and June 18, 1984, Yost told him that bids were going to be submitted for independent contracting. There was no formal invitation for the union to bid. On June 4, 1984, Yost sent Brandhorst a copy of the bid specifications for custodial services. On May 17, 1984, the board of education voted to accept bids for custodial services. The board of education members stated that the bids were received to determine the actual cost. Bids were opened on June 11, 1984. Brandhorst was present when the bids were opened. He was told that City Wide Maintenance had a low bid of $105,000, plus approximately $4,000 for extra duties.

On June 15, 1984, Yost sent Brandhorst a letter stating that because of the great cost savings, the District was seriously considering a subcontract for custodial services. The letter asked to meet with the union as soon as possible to bargain on the matter. The letter also noted that the District was willing to explain the economic reasons and potential savings involved in a subcontract arrangement. The letter noted that the bid which had been received from City Wide Maintenance was approximately $135,000 less than the cost projection for in-house custodial work.

The bargaining committees for SEIU and the District met again

on June 18, 1984. Yost testified that he told SEIU that he was shocked about the potential cost savings. He specifically asked Brandhorst to bargain along the line of a money figure which would match City Wide Maintenance's bid. Brandhorst was concerned that the independent contractor could not meet the bid specifications for cleaning. Yost told him that the bid included a performance bond, which the District would enforce. Yost further stated that he also told Brandhorst that the bid did not take into consideration the possible savings that could be incurred through the independent contracting of maintenance work.

Brandhorst testified that Andrea Waintroob, the District's attorney, stated that there was a strong possibility that the District would subcontract custodial and maintenance services. Brandhorst admitted that he asked questions about the maintenance service since previously he had not been told that the independent contracting of maintenance work was a possibility.

Brandhorst further admitted that he was aware of the bid specifications for custodial services. Yost told him on June 18, 1984, that the approximate total cost of in-house work was $235,000 for the 1983-84 school year. At the June 18, 1984, meeting, the District indicated that it was willing to discuss effects bargaining. The meeting lasted approximately two hours.

On June 20, 1984, Terry Jones, owner of the City Wide Maintenance, sent a letter to Yost. The letter stated that Jones was confident that City Wide Maintenance could adequately perform cleaning and maintenance functions. Jones testified that the letter was one of confidence only. Yost told him that City Wide Maintenance was the low bidder but that the board of education would decide about any agreement. On June 20, 1984, all that Jones knew was that City Wide Maintenance was the low bidder.

SEIU and the District met again on June 27, 1984, at Brandhorst's request. Brandhorst admitted that he asked Yost what SEIU's next step should be. Brandhorst stated Yost told him to formulate a proposal based upon existing conditions. The District's representative, Waintroob, asked for counterproposals. The District assured Brandhorst that cost was the only factor and it was willing to discuss the union's proposal. Brandhorst admitted that he extensively discussed the basis for a counterproposal from SEIU. Ultimately, Yost told him to follow the bid specifications. Brandhorst stated that they also discussed whether SEIU would be able to maintain work quality if it reduced man-hours.

Brandhorst further testified that after the June 27, 1984, meet-

ing, he and Yost discussed methods which SEIU could use to bring its counterproposal close to the City Wide Maintenance bid. On July 17, 1984, Brandhorst presented SEIU's proposal, which addressed only custodial services, called for reduced employee hours, and had a longer summer layoff period. The projected cost was $157,525. This was approximately $48,000 higher than City Wide Maintenance's bid. Brandhorst testified that the proposal did not address maintenance work but was along the bid specification lines.

Yost testified that he asked Brandhorst why the maintenance people were omitted. Yost stated that Brandhorst indicated that there were more custodians than maintenance men. Yost testified that he did not tell Brandhorst to omit submitting a proposal as to maintenance employees. SEIU did not seek to submit a proposal about maintenance employees. Yost further stated that he never told Brandhorst not to negotiate on the maintenance contract.

On July 18, 1984, the board of education rejected SEIU's proposal. On July 24, 1984, Yost told Brandhorst that the District had rejected the proposal. The parties then signed a request for mediation. At the mediation session, Brandhorst stated that he had given the District the union's "bottom line." Brandhorst further testified that the District's attorney stated the proposal was rejected because of cost and because the union could not guarantee quality. Brandhorst then declared an impasse.

On August 22, 1984, the board of education voted to accept City Wide Maintenance's bid and terminate the employment of the custodians. Effects bargaining began. On September 12, 1984, the District entered into a contract with City Wide Maintenance for custodial services. Subsequently, they entered into a maintenance service contract.

The hearing officer determined that the District failed to bargain in good faith prior to its decision to subcontract maintenance and custodial services. However, she found no antiunion animus. The Board modified the hearing officer's findings of fact, rejected her formulation of the good-faith bargaining standard in subcontracting situations, and determined that the District bargained in good faith.

SEIU filed a timely petition for direct administrative review.

Section 1 of the Illinois Educational Labor Relations Act (Act) provides that it is the policy of the State to promote orderly and constructive relationships between educational employees and employers. (Ill. Rev. Stat. 1985, ch. 48, par. 1701.) To effectuate this policy, sections 3 and 4 of the Act provide that the collective-bargaining representative of the employees and the employer have a concomitant right and duty to bargain on issues "affecting wages, hours and terms and

conditions of employment." (Ill. Rev. Stat. 1985, ch. 48, pars. 1703, 1704.) However, employers are not required to bargain over matters of inherent managerial policy. Ill. Rev. Stat. 1985, ch. 48, par. 1704.

Section 10 of the Act states that the duty to bargain includes a mutual obligation "to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment." (Ill. Rev. Stat. 1985, ch. 48, par. 1710.) However, the duty to bargain in good faith does not compel either party to agree to a proposal or require the making of a concession. (Ill. Rev. Stat. 1985, ch. 48, par. 1710.) Finally, section 14 of the Act provides that an employer commits an unfair labor practice when it refuses to bargain in good faith or interferes with the rights of employees under the Act. (Ill. Rev. Stat. 1985, ch. 48, pars. 1714(a)(1), (a)(5).) The above sections of the Act parallel the Labor Management Relations Act of 1947 (LMRA) (29 U.S.C. sec. 141 *et seq.* (1982)), and, therefore, cases interpreting the LMRA are persuasive authority. See generally *Board of Education v. Illinois Educational Labor Relations Board* (1986), 143 Ill. App. 3d 898, 493 N.E.2d 1130.

■ The "contracting out" of work previously performed by members of an existing bargaining unit is a subject about which the LMRA requires employers and representatives of their employees to bargain collectively. Contracting out, hiring of independent contractors to perform work which was formerly bargaining-unit work, is encompassed in the phrase "terms and conditions of employment." *Fibreboard Paper Products Corp. v. NLRB* (1964), 379 U.S. 203, 13 L. Ed. 2d 233, 85 S. Ct. 398; *General Drivers Union Local 346 v. Independent School District 704* (Minn. 1979), 283 N.W.2d 524; *Unified School District No. 1 v. Wisconsin Employment Relations Com.* (1977), 81 Wis. 2d 89, 259 N.W.2d 724; *In re Saratoga Springs City School District v. New York State Public Employment Relations Board* (1979), 68 A.D.2d 202, 416 N.Y.S.2d 415.

In the instant case, the parties agree that the District's decision to contract out its custodial and maintenance work was a mandatory subject of bargaining under the Act. They also agree that the District bargained in good faith over the effects of its decision. Thus, the primary area of dispute is whether the District bargained in good faith over its "decision" to contract out bargaining-unit work. The hearing officer determined, based upon a "totality of the circumstances" analysis, that the District had bargained in bad faith as to its decision to contract out bargaining-unit work. She concluded that good faith had to be assessed by viewing the employer's conduct during the negotiation process, by viewing the totality of the circumstances leading to

the employer's decision, and by considering whether the employer conceded on any issue, had a take-it-or-leave-it approach, or merely engaged in sham negotiations. She concluded that even if the individual factors would not result in an unfair labor practice, the total impact of the employer's conduct could show bad faith.

■ The Board stated that the Act required employers to bargain in good faith over mandatory subjects. Good faith meant the employer had to approach the situation with an open mind. The Board further stated that good faith in the subcontracting situation means the employer must notify the union, meet with it, provide necessary information so the union understands the problem, and consider any proposals the union makes.

SEIU argues that the totality-of-the-circumstances approach is the correct method to assess good faith in a subcontracting context. Because the Board rejected this standard, SEIU maintains that it reached a legally erroneous result.

Good faith in the overall bargaining context is assessed upon a review of all of the circumstances. However, the concept is variable and factors which indicate bad-faith bargaining in one circumstance will not be determinative in a different setting. (See C. Morris, *The Developing Labor Law* 570-606 (2d ed. 1983); *NLRB v. General Electric Co.* (2d Cir. 1969), 418 F.2d 736, 756; *NLRB v. I.B.S. Manufacturing Co.* (5th Cir. 1954), 210 F.2d 634, 638.) The duty to bargain in good faith does not obligate parties to yield fairly maintained positions or make concessions. (*NLRB v. American National Insurance Co.* (1952), 343 U.S. 395, 96 L. Ed. 1027, 72 S. Ct. 824.) However, the parties are obligated to do more than go through the motions of bargaining. (*Continental Insurance Co. v. NLRB* (2d Cir. 1974), 495 F.2d 44, 47-48.) In *NLRB v. Insurance Agents International Union* (1960), 361 U.S. 477, 4 L. Ed. 2d 454, 80 S. Ct. 419, the Supreme Court stated that good faith is essential to collective bargaining and bargaining does not simply mean a formal meeting where each side maintains a take-it-or-leave-it attitude. Good-faith bargaining, thus, presupposes an open mind and a sincere desire to reach an ultimate agreement. See *NLRB v. W.R. Hall Distributor* (10th Cir. 1965), 341 F.2d 359.

In the subcontracting situation, however, standards of good-faith bargaining are assessed in light of the fact that the employer is considering a decision, which, although it drastically affects its employees, also involves a policy and inherent management function. In *Fibreboard*, the court determined that contracting out of bargaining-unit work to independent contractors was a subject of mandatory bargaining. The Court stated that it was not necessary that bargaining be

likely to yield or to find a feasible solution to the decision. Rather, the union should be allowed an opportunity to address management's legitimate complaints. *Fibreboard Paper Products Corp. v. NLRB* (1964), 379 U.S. 203, 13 L. Ed. 2d 233, 85 S. Ct. 398; *American President Lines, Ltd.* (1977), 229 N.L.R.B. 443.

After *Fibreboard,* the NLRB and the Federal circuit courts presented several guidelines for good-faith bargaining in the subcontracting situation. First, the union must be notified that subcontracting is under consideration prior to the decision to subcontract and terminate the employment of union members. (*Soule Glass & Glazing Co. v. NLRB* (1st Cir. 1981), 652 F.2d 1055, 1084.) In *Soule,* the court stated:

> "Good faith bargaining requires timely notice and a meaningful opportunity to bargain regarding the employer's proposed changes." 652 F.2d 1055, 1084.

In *Amcar Division, ACF Industries, Inc. v. NLRB* (8th Cir. 1979), 596 F.2d 1344, the court stated that in the subcontracting situation, the NLRA requires the decision be submitted to the mediatory influence of collective bargaining so the union may meet management's complaints. However, the negotiations need not be as formal or as extensive as negotiations for a new contract. (See also *Shell Oil Co.* (1964), 149 N.L.R.B. 305.) If the union is given notice, an opportunity to negotiate before the subcontracting decision is finalized, and the employer bargains over the effects of its decision, no unfair labor practice will be found, absent antiunion animus or evidence of sham negotiations. *Olinkraft, Inc. v. NLRB* (5th Cir. (1982), 666 F.2d 302, 308; *Salem College* (1982), 261 N.L.R.B. 327.

The Supreme Court in *First National Maintenance Corp. v. NLRB* (1981), 452 U.S. 666, 678 n.17, 69 L. Ed. 2d 318, 331 n.17, 101 S. Ct. 2573, 2581 n.17, addressed the issue of whether an employer must, under its duty to bargain in good faith, negotiate with certified representatives of its employees over its decision to close part of its plant operation. The court held that an employer's economically motivated decision to close a part of its business, as distinguished from contracting out work, was not a mandatory subject of bargaining. In a footnote, the Supreme Court stated the standard which the Board quoted and used to assess good faith in the instant situation. The *First National Maintenance* court noted that on proper subjects, the employer must meet with the union, provide information so that the union might understand its problem, and consider any proposals.

■ The Board in the instant case correctly utilized the standard for determining good faith which has developed in the subcontracting

context. In the subcontracting context, the requirements for good-faith bargaining on the decision to subcontract are notice of the consideration of a subcontract, before it is finalized; meeting with the union to provide an opportunity to discuss and explain the decision; providing information to the union; and giving consideration to any counterproposals the union makes.

 In light of the above, we turn to SEIU's argument that the Board's decision was contrary to the manifest weight of the evidence. Under section 3—110 of the Code of Civil Procedure, the findings and conclusion of an administrative agency on questions of fact are considered *prima facie* true and correct. (Ill. Rev. Stat. 1985, ch. 110, par. 3—110; *Murdy v. Edgar* (1984), 103 Ill. 2d 384, 469 N.E.2d 1085; *Board of Education v. Illinois Educational Labor Relations Board* (1986), 143 Ill. App. 3d 898, 493 N.E.2d 1130.) Courts may not interfere with the discretionary authority vested in an administrative agency unless that authority is exercised in an arbitrary or capricious manner or the administrative decision is contrary to the manifest weight of the evidence. (*Murdy v. Edgar* (1984), 103 Ill. 2d 384, 469 N.E.2d 1085.) A decision is contrary to the manifest weight of the evidence only when, after viewing the evidence in a light most favorable to the agency, the court determines that no rational trier of fact could have agreed with the agency's decision. *Agans v. Edgar* (1986), 142 Ill. App. 3d 1087, 1094, 492 N.E.2d 929, 933.

██ It is uncontested that Yost notified Brandhorst that the subcontracting of custodial personnel was under consideration in late March or early April of 1984. This notice was prior to the letting of bids and while the District was in the process of gathering information on subcontracting. On May 11, 1984, at a meeting between SEIU and the District, SEIU was told that the District was considering contracting out its custodial services. On June 4, 1984, Yost sent Brandhorst a copy of the bid specifications for custodial work. After the bids were opened and City Wide Maintenance's low bid assessed, the District sent Brandhorst a letter asking for a meeting as soon as possible to "bargain" on the subcontracting decision.

Yost and Brandhorst agree that on June 18, 1984, they discussed the possible savings that could be incurred through contracting out maintenance work as well as custodial work. Also, Brandhorst testified that the District's spokesperson stated that there was a strong possibility that the District would contract out maintenance as well as custodial work. At this meeting of the bargaining committee, the parties discussed quality control and whether the independent contractor could meet the bid specification.

Therefore, the record supports a determination that SEIU was on notice of the subcontracting decision as to both maintenance and custodial employees as of June 18, 1984. The actual decision to contract out services was not made until August of 1984. On June 20, 1984, Yost received a letter in which the owner of the independent contractor stated that he was sure that his firm would do an adequate job and comply with the bid specifications. The hearing officer interpreted this letter as "confirming" the subcontract award. However, Yost and Jones stated that the letter was one of confidence only; no statement was made that the independent contractor would be awarded the contract. The Board rejected the hearing officer's findings as to the letter and noted that it was not an indication that the contract had been awarded prior to SEIU's being given an opportunity to bargain over the decision.

On June 27, 1984, Brandhorst again met with part of the District's bargaining team. Yost explained that cost was the overriding factor. Yost and Brandhorst disagreed as to whether Yost told Brandhorst to formulate a proposal only on custodial work and on whether Yost told Brandhorst to make a proposal based upon existing conditions. It is uncontested, however, that SEIU's proposal was not based upon existing conditions and covered only custodial services.

SEIU argues that the hearing officer's credibility determination should be accepted by the court, and the Board's determinations rejected. However, the court, in reviewing an administrative finding, reviews the Board's determination and accepts its determination as *prima facie* true and correct. (Ill. Rev. Stat. 1985, ch. 110, par. 3—110.) The bid which the union submitted was approximately $48,000 higher than the independent contractor's bid. After the union's proposal had been considered, it was rejected on financial grounds. The District then awarded the contract for custodial services to the independent contractor and later it awarded a contract for maintenance services.

From the sequence of events, the District notified, met and discussed the proposal, and considered the union's counterproposal before finalizing its subcontracting plans. The District was not obligated to compromise. (Ill. Rev. Stat. 1985, ch. 48, par. 1710; *NLRB v. American National Insurance Co.* (1952), 343 U.S. 395, 96 L. Ed. 1027, 72 S. Ct. 824; *Pease Co. v. NLRB* (6th Cir. 1981), 666 F.2d 1044.) In the area of subcontracting, if the employer were required to compromise, the Board would in effect be determining the substance of the bargaining agreement and the circumstances under which an employer could determine to contract out bargaining-unit work.

We also do not find that the fact that effects bargaining was mentioned early in the process is determinative of bad faith in the subcontracting context. The mentioning of effects bargaining early in the process was a factor of the vast difference in cost between the independently contracted services and the in-house services.

The Board's determination was not contrary to the manifest weight of the evidence. *Murdy v. Edgar* (1984), 103 Ill. 2d 384, 469 N.E.2d 1085; *Agans v. Edgar* (1986), 142 Ill. App. 3d 1087, 492 N.E.2d 929.

■ SEIU next argues that the District committed a *per se* violation of its duty to bargain over the maintenance subcontract because it was never afforded an opportunity to discuss the decision. The record belies this contention. When an employer has a duty to bargain about an issue which is a mandatory subject of collective bargaining and refuses to negotiate, it commits a *per se* unfair labor practice. Concepts of good-faith bargaining are not reached. However, when an employer has the duty to bargain, it need only provide notice of its willingness to bargain prior to the time at which its plans are fixed. *Coated Products, Inc.* (1978), 237 N.L.R.B. 159, *enforced without opinion, Pennsylvania Avenue Development Corp. v. 1 Parcel of Land* (3d Cir. 1980), 670 F.2d 289.

Here, the undisputed evidence shows SEIU had notice as to both maintenance and custodial workers by June 18, 1984. Yost and Brandhorst differed widely about whether Yost instructed Brandhorst to formulate a proposal only as to custodial employees. The Board's decision did not directly address this argument, but the Board accepted Yost's testimony. Once a union has been notified of a topic of bargaining, it must pursue bargaining. Under the facts presented here, no *per se* refusal to bargain occurred.

For the above reasons, we affirm the Board.

Affirmed.

SPITZ, P.J., and GREEN, J., concur.