THE BOARD OF TRUSTEES OF SOUTHERN ILLINOIS UNIVERSITY, Plaintiff-Appellant, v. JAMES KNIGHT *et al.*, Defendants-Appellees.

Fifth District   No. 5—86—0319

Opinion filed December 3, 1987.

WELCH, J., dissenting.

Reed, Armstrong, Gorman & Coffey, P.C., of Edwardsville, for appellant.

Bruce Goldstein, of Edwardsville, for appellee James Knight.

Neil F. Hartigan, Attorney General, of Springfield, (Roma Jones Stewart, Solicitor General, and Bret A. Rappaport, Assistant Attorney General, of Chicago, of counsel), for appellee Human Rights Commission.

JUSTICE HARRISON delivered the opinion of the court:
The board of trustees of Southern Illinois University (SIU) ap-

peals from a judgment of the circuit court of Madison County which upheld on administrative review an order of the Illinois Human Rights Commission (the Commission). In that order, the Commission found that SIU had violated the Illinois Human Rights Act (Ill. Rev. Stat. 1983, ch. 68, par. 1—101 *et seq.*) when it refused to hire James Knight, who is black, as a "Police Officer Learner" because of the record of his arrest and conviction for unlawful possession of a weapon, a misdemeanor, approximately five years earlier. To remedy this violation, the Commission's order granted various forms of relief to Knight, including a requirement that he be hired by SIU with back pay and an award of his reasonable costs and attorney fees.

On this appeal, SIU does not take issue with the particular remedy fashioned by the Commission. Rather, it makes the more fundamental claim that the Commission's finding of a civil rights violation is contrary to the manifest weight of the evidence. Specifically, SIU contends that its reliance on Knight's arrest and conviction record in rejecting his job application was shown to be justifiable on grounds of business necessity. For the reasons which follow, we find this contention to be without merit. We therefore affirm.

■■ ■ Section 8—111(A)(1) of the Illinois Human Rights Act (Ill. Rev. Stat. 1983, ch. 68, par. 8—111(A)(1)) provides that our review of the Commission's order must be made in accordance with the Administrative Review Law, as amended (Ill. Rev. Stat. 1983, ch. 110, par. 3—101 *et seq.*). Pursuant to section 3—110 of that law (Ill. Rev. Stat. 1983, ch. 110, par. 3—110), the findings and conclusions of an administrative agency are held to be *prima facie* true and correct. (*Rackow v. Illinois Human Rights Comm'n* (1987), 152 Ill. App. 3d 1046, 1061, 504 N.E.2d 1344, 1354.) A reviewing court may not reweigh the evidence, but may determine only whether the agency's decision is against the manifest weight of the evidence. (See *Collura v. Board of Police Commissioners* (1986), 113 Ill. 2d 361, 372-73, 498 N.E.2d 1148, 1153.) A decision is contrary to the manifest weight of the evidence only when, after viewing the evidence in a light most favorable to the agency, the court determines that no rational trier of fact could have agreed with the agency's decision. *Service Employees International Local Union No. 316 v. Illinois Educational Labor Relations Board* (1987), 153 Ill. App. 3d 744, 753, 505 N.E.2d 418, 425.

In this case the evidence showed that in 1975 Knight enrolled as a student at SIU in Edwardsville. In 1977 he was hired by Modern Security Agency, which had a contract with SIU. Knight was initially assigned as a security officer in one of SIU's buildings, but was ultimately promoted to the rank of patrol sergeant. Knight was licensed

by the State of Illinois as a security officer in 1977, and while working for Modern Security Agency he carried a pistol. Knight left his employment with the agency in September of 1978 when the agency lost its contract with SIU. According to Knight's supervisor at the agency, Knight was a very good employee and maintained a good relationship with both the public and his fellow employees. The supervisor indicated that he would rehire Knight if the occasion were to arise.

In November of 1978 Knight became an auxiliary police officer with the East St. Louis police department. He graduated from the East St. Louis police department's training program and received firearms training from the State. As an auxiliary police officer, Knight was required to carry a gun and make arrests. He advanced to the rank of sergeant in 1981 and was responsible for supervising the 30 or so officers in the auxiliary unit. Knight's service with that unit was purely voluntary. At the time of the hearing on his complaint he continued to hold the rank of sergeant and worked 40 or more hours a week. The record indicates that he received a merit award from the mayor of East St. Louis for his service.

Knight originally applied for the position of "Police Officer I" with SIU. He had learned about the job while an employee of Modern Security and submitted his application on February 15, 1978. Thereafter, by letter dated March 16, 1979, Knight advised SIU's affirmative action officer, Benjamin Quillian, Ph.D., that he wanted to be considered for a position on SIU's police department in the capacity of "Police Officer Learner." The learner program is a method of recruiting members of minority groups for the SIU police department. Learners are placed on probation for 18 months, after which they are eligible to assume the rank of "Police Officer I."

Knight interviewed with the screening committee set up by SIU for its learner program. Based on his examination scores and other criteria, Knight was ranked seventh out of 12 finalists. In November 1979, a white female officer on the force resigned and was replaced by another white female who had ranked sixth on the learner program list. The following summer an additional position opened up on the force. It was this position for which Knight was considered.

SIU's police department conducted a background investigation of Knight to determine his "suitability for employment as an [SIU] Police Officer." The investigation involved inquiries of the following:

    1. Illinois Department of Law Enforcement (criminal history);

    2. Illinois Secretary of State (operator's license information);

    3. East St. Louis police department;

4. Dan Truck and Motor Company (former employer);

5. Modern Security Agency (former employer);

6. Mr. Irvin Hudlin, administrative assistant to the director of SIU's East St. Louis Center; and

7. United States post office (SIU Edwardsville branch) (employer).

Charles McDonald, SIU's chief of police at all times relevant to this dispute, testified that such a background investigation is standard procedure for all applicants to SIU's police department.

Each of Knight's employers attested to Knight's ability and qualifications. In addition, numerous character references were sent to the department on his behalf. The only negative matter disclosed by the background investigation was that Knight had been arrested at St. Mary's Hospital in East St. Louis on September 4, 1975, and charged with a violation of section 24—1(a)(10) of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 24—1(a)(10)), possession of a firearm within city limits. Knight pleaded guilty to the offense and paid a fine of $100 plus court costs. Although Knight was never arrested or convicted for any offense other than this one, the arrest report concerning the offense alleged that Knight had been in a fight at St. Mary's with another black male and had tried to shoot him. Chief McDonald (who had once been charged with disorderly conduct and interference with a police officer) decided that he could not hire Knight based on this record of his arrest and conviction and instead hired a white male for the job.

Thereafter Knight filed a race discrimination charge with the Illinois Department of Human Rights (the Department). Based on that charge, the Department issued a complaint against SIU in which it alleged, *inter alia*, that SIU had discriminated against Knight because of his race in violation of section 2—102(A) of the Illinois Human Rights Act (Ill. Rev. Stat. 1983, ch. 68, par. 2—102(A)) (the Act). Following an administrative hearing on the complaint pursuant to section 8—106 of the Act (Ill. Rev. Stat. 1983, ch. 68, par. 8—106) and upon review of the hearing officer's recommended order (see Ill. Rev. Stat. 1983, ch. 68, par. 8—107), the Commission determined that SIU had committed a civil rights violation. The Commission's order was upheld by the circuit court of Madison County on administrative review, and this appeal followed.

The Illinois Human Rights Act prohibits any employer from refusing to hire a person on the basis of "unlawful discrimination." (Ill. Rev. Stat. 1983, ch. 68, par. 2—102(A).) "Unlawful discrimination" is defined by the Act to include discrimination against a person because

of his or her race. (Ill. Rev. Stat. 1983, ch. 68, par. 1—103(Q).) In analyzing claims of discrimination under the Act, Illinois courts have looked to the standards applicable to Federal claims brought under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e *et seq.* (1981)). *Valley Mould & Iron Co. v. Illinois Human Rights Comm'n* (1985), 133 Ill. App. 3d 273, 279, 478 N.E.2d 449, 453.

Under Title VII a claim of employment discrimination can be brought under either a "disparate treatment" theory (see *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817) or a "disparate impact" theory (see *Griggs v. Duke Power Co.* (1971), 401 U.S. 424, 28 L. Ed. 2d 158, 91 S. Ct. 849). The disparate treatment theory applies where a claim is made that an employer is intentionally discriminating against individuals protected by Title VII. (*Domingo v. New England Fish Co.* (9th Cir. 1984), 727 F.2d 1429, 1435, *modified on other grounds* (1984), 742 F.2d 520.) The disparate impact theory is used where a claim is made that some facially neutral employment practice has a significantly disproportionate impact on a group protected by Title VII. (727 F.2d at 1435.) Both theories have been expressly recognized by this court in considering alleged violations of the Illinois Human Rights Act and its predecessor provisions. See, *e.g., Board of Education of Waterloo Community Unit School District No. 5 v. Human Rights Comm'n* (1985), 135 Ill. App. 3d 206, 481 N.E.2d 994 (disparate treatment); *City of Cairo v. Fair Employment Practices Comm'n* (1974), 21 Ill. App. 3d 358, 315 N.E.2d 344 (disparate impact).

In the case before us, the Commission's order found that discrimination had been proved under the theory of disparate impact. A *prima facie* case of discrimination is established under this theory where the complainant can show that an employment practice, while facially neutral, has a significant discriminatory impact on the minority group to which the complainant belongs. If that showing is made, the burden then shifts to the employer to demonstrate that the practice has a manifest relationship to the employment in question. (*Connecticut v. Teal* (1982), 457 U.S. 440, 446, 73 L. Ed. 2d 130, 137, 102 S. Ct. 2525, 2530.) "The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Griggs v. Duke Power Co.* (1971), 401 U.S. 424, 431, 28 L. Ed. 2d 158, 164, 91 S. Ct. 849, 853.

The parties have cited no Illinois authority construing the standards for "business necessity" in the context of a disparate impact claim, but Federal precedent suggests that these standards are strict.

Business necessity is not synonymous with managerial convenience. (*Rodriquez v. East Texas Motor Freight* (5th Cir. 1974), 505 F.2d 40, 56, *vacated on other grounds* (1977), 431 U.S. 395, 52 L. Ed. 2d 453, 97 S. Ct. 1891.) To withstand challenge, a discriminatory employment practice must be shown to be necessary to safe and efficient job performance. (*Dothard v. Rawlinson* (1977), 433 U.S. 321, 331-32 n.14, 53 L. Ed. 2d 786, 799 n.14, 97 S. Ct. 2720, 2728 n.14.) Moreover, " '[n]ecessity connotes an irresistible demand.' " (*Rodriquez v. East Texas Motor Freight* (5th Cir. 1974), 505 F.2d 40, 56, *vacated on other grounds* (1977), 431 U.S. 395, 52 L. Ed. 2d 453, 97 S. Ct. 1891, quoting *United States v. Bethlehem Steel Corp.* (2nd Cir. 1971), 446 F.2d 652, 662.) Accordingly, "[i]t is clear that business necessity is limited to those cases where an employer has no other choice." (*Watkins v. Scott Paper Co.* (5th Cir. 1976) 530 F.2d 1159, 1181, *cert. denied* (1979), 429 U.S. 861, 50 L. Ed. 2d 139, 97 S. Ct. 163.) If the legitimate ends of safety and efficiency can be served by a reasonably available alternative system with less discriminatory effects, then the challenged practice will be found unlawful. See *United States v. Bethlehem Steel Corp.* (2d Cir. 1971), 446 F.2d 652, 662.

As our previous discussion has indicated, Knight, the complainant in this case, was denied employment by SIU's police department for no reason other than his record of arrest and conviction. The courts of this State have long recognized that arrest-record hiring criteria have an inherently discriminatory impact upon black job applicants. (See, *e.g.*, *City of Cairo v. Fair Employment Practices Comm'n* (1974), 21 Ill. App. 3d 358, 365, 315 N.E.2d 344, 349; *Abex Corp., Amsco Division v. Illinois Fair Employment Practices Comm'n* (1977), 49 Ill. App. 3d 469, 474-75, 364 N.E.2d 495, 498-99; *Del Rivero v. Cahill* (1979), 71 Ill. App. 3d 618, 622, 390 N.E. 2d 355, 359.) Knight submitted evidence to corroborate such a finding here. That evidence included the uncontroverted expert testimony of Benjamin Quillian, Ph.D., the affirmative action officer at SIU. Dr. Quillian stated that blacks are arrested at a higher rate, as a percentage of the total black population, than are whites as a percentage of the total white population. In his opinion, "minority groups, particularly blacks, tend to run into trouble with the Police at a level that would suggest discrimination on the part of Police departments." Correspondingly, Dr. Quillian confirmed that use of arrest records tends to eliminate blacks from employment in a higher percentage than whites. It is, in other words, racially discriminatory in effect.

This point has never been seriously questioned by SIU. Nor has SIU denied that the use of conviction-record hiring criteria has a

similar discriminatory effect on minority job applicants. Because of this discriminatory effect, an employer may not automatically bar a minority applicant from consideration for employment simply because the applicant has been convicted of a crime. (See *Carter v. Gallagher* (8th Cir. 1971), 452 F.2d 315, 326, *cert. denied* (1972), 406 U.S. 950, 32 L. Ed. 2d 338, 92 S. Ct. 2045; *Green v. Missouri Pacific R.R. Co.* (8th Cir. 1975), 523 F.2d 1290, 1298; 45A Am. Jur. 2d *Job Discrimination* §478, at 454 (1986); *Cook County Police & Corrections Merit Board v. Illinois Fair Employment Practices Comm'n* (1978), 59 Ill. App. 3d 305, 310, 376 N.E.2d 11, 14.) SIU nevertheless asserts that its refusal to hire Knight was proper here because it was based not on the record of Knight's arrest and conviction, as such, but rather on the "facts and circumstances" surrounding his arrest and conviction. SIU contends that Knight failed to establish that this "practice" had an adverse impact on blacks. In the alternative, it argues that the practice was justified by business necessity. These claims have no merit.

SIU did not dispute the racially discriminatory effects of its consideration of the so-called "facts and circumstances" surrounding Knight's arrest and conviction either before the Commission or at the circuit court level. Indeed, this point was not even seriously addressed by SIU on appeal until it filed a supplemental brief. SIU claims that it was not required to raise the matter sooner. We disagree. The issue is waived. We turn then to the question of business necessity, the only matter properly before us.

■ Although the nature of a conviction may be considered under proper circumstances in determining a minority job applicant's suitability for employment (see *Carter v. Gallagher* (8th Cir. 1971), 452 F.2d 315, 326, *cert. denied* (1972), 406 U.S. 950, 32 L. Ed. 2d 338, 92 S. Ct. 2045; *Green v. Missouri Pacific R.R. Co.* (8th Cir. 1975), 523 F.2d 1290, 1298; Annot., 33 A.L.R.F. 263, 286 (1977)), the only conviction at issue here was, as we have noted, for a single misdemeanor weapons possession charge. That conviction was imposed some five years before Knight's job application was denied and was remote in time. In addition, during the years following the conviction Knight established a history of professional and responsible police and police-related work which involved the use of firearms. SIU has adduced no evidence to show how, under these circumstances, Knight's conviction could reasonably be related to his present ability to perform acceptably on the job.

In point of fact the record shows that SIU's refusal to hire Knight had little to do with the nature of the crime for which he was actually

convicted, but was based instead on the much broader allegations contained in the police report of the arrest which led to that conviction. As we have suggested, that report, which was admitted into evidence over objection, indicated that the security guard at St. Mary's Hospital in East St. Louis had told two East St. Louis police officers who had been called to the scene that Knight had been involved in a fight with another black male and attempted to shoot him with a revolver. None of these events was personally observed by the reporting officers, and Chief McDonald recognized that despite the allegations, Knight was not charged with any crime involving assault or battery. Nevertheless, he indicated that his concern was not simply that Knight had possessed a firearm unlawfully, the basis for his arrest and conviction, but that Knight had allegedly done so "to do bodily harm to somebody else."

McDonald explained that he was sensitive about these allegations because at that time the department was in the process of firing an officer who had been involved in various incidents, including what McDonald characterized as "a misuse of a weapon while he was on duty." He also expressed some vague concern about the use of firearms in a "university context." These contentions are insufficient to justify SIU's actions.

While we have held that an employer may, in a proper case, take into account the nature of a conviction in making employment decisions, we also acknowledge that a conviction is not required before an employer may consider a job applicant's or employee's criminal conduct. Even absent a conviction, an employer may legitimately fire or refuse to hire an individual where the employer can actually prove that the individual has engaged in criminal conduct and that such conduct relates to the particular job requirements in question. See *Del Rivero v. Cahill* (1979), 71 Ill. App. 3d 618, 622, 390 N.E.2d 355, 359.

In this case, however, there is no evidence to substantiate the existence of any unrest in the university community over the use of firearms. Moreover, the record reveals that the specific charges against the other officer to whom Chief McDonald referred were: (1) drinking intoxicants in a State vehicle while on duty en route to the Police Academy, (2) threatening a fellow police officer with a handgun while under the influence, (3) conduct unbecoming of an officer in using abusive language toward a fellow officer, (4) violating a department policy by removing a handgun from its holster without just cause, (5) refusing to cooperate during an investigation of the university police department, and (6) conspiring with a fellow officer not to report an incident under investigation. Reasonable minds may differ on the

question of whether the allegations made against Knight are as serious as these charges. In any event, we observe that this officer had apparently never been arrested or convicted of any offense before being hired by the Department, and SIU offered no factual basis upon which one could reasonably conclude that Knight, whose arrest and conviction had taken place some five years earlier, before he had received his police training and experience, would be likely to engage in this or any other type of wrongdoing in the future.

Chief McDonald's purported reliance on the Department's experience with the other police officer was misplaced for another reason. All of the charges against that officer were ultimately corroborated through competent evidence. By contrast, SIU failed to establish the truth of any of the allegations made against Knight in the arrest report regarding his supposed attempt to shoot someone. There is no dispute that the report of Knight's 1975 arrest constituted nothing more than hearsay within hearsay, yet Chief McDonald testified that he took that report at face value. He stated, "I let the Police Report stand on its own." SIU obtained no independent corroboration of the allegations in that report. According to Chief McDonald, "All I did was take the Police Report and make my decision upon that report."

Knight, for his part, testified that the allegations in the report were untrue. Knight explained that while driving to school one evening, a woman with whom he was acquainted flagged down his car on the street and asked him if he would give her a ride to the hospital. He observed that the woman had been beaten badly and was in need of medical attention. Knight took her to St. Mary's emergency room and waited for her. While Knight was there, the woman's boyfriend arrived and exchanged words with Knight in the lobby. Knight explained to the individual that he was waiting to hear from the woman regarding what she wanted her babysitter to do about her children. The boyfriend told Knight that he did not need to wait and could leave. He then struck Knight repeatedly.

At this point the hospital security guard grabbed the boyfriend and forcibly removed him from the hospital. The police were called. When they arrived they spoke with the security guard as well as with Knight and the woman. They searched both Knight and the woman and found a revolver in the purse she was carrying.

When the police indicated that they were going to arrest the woman, Knight told them that the revolver belonged to him even though it did not. He explained that he did so because the woman had been severely beaten, her jaw was broken in two places, and she was supposed to be transferred to Firmin Desloge Hospital in St. Louis to

have her mouth wired shut, yet "the Officer didn't seem to care as to how badly she was hurt." Knight was apparently fearful that the woman would suffer further if this medical treatment were delayed by an arrest and did not want this to happen. In his words, "I was being helpful and that's what I felt inside of me that that was right to do, [sic] I was being helpful."

At the time SIU made its decision not to hire Knight, it had no evidence to rebut Knight's version of what had transpired. Nor was it able to adduce such evidence during the proceedings before the Commission. SIU points out that it did attempt to obtain the records of the criminal proceedings in which Knight pleaded guilty to the unlawful possession charge, but was unable to do so because the court file had been destroyed. This, however, was not the only independent source of information about the incident. The woman who had been beaten, the hospital security guard, and the arresting officers all might have been interviewed. They were not, and SIU offers no good explanation as to why they were not.

SIU further points out that Chief McDonald thought that Knight's version of the incident contained some serious discrepancies and that Knight had said that he would not have authorized a background investigation if he had known that SIU would learn of the arrest. From this we are apparently supposed to infer that Knight was lying and that the allegations contained in the arrest report were probably correct. The record makes apparent, however, that the Commission found Knight's testimony to be credible and that it believed his story. The credibility of witnesses is a matter within the province of the administrative agency and will not be second-guessed by this court. See *Jackson v. Board of Review of Department of Labor* (1985), 105 Ill. 2d 501, 513, 475 N.E.2d 879, 885.

■ Because SIU thus failed to establish through competent evidence the "facts and circumstances" set forth in the report of Knight's arrest, we are unable to see how this case can be distinguished from those decisions previously cited which have found improper the use of arrest-record criteria in making employment decisions about minority applicants and employees. After all, absent independent proof of the facts and circumstances in an arrest report, what is reliance on such facts and circumstances if it is not reliance on an arrest record? In our view, the difference, if any, is purely semantical.

SIU attempts to justify its position by citing *Webster v. Redmond* (7th Cir. 1979), 599 F.2d 793, *cert. dismissed* (1980), 444 U.S. 1040, 62 L. Ed. 2d 675, 100 S. Ct. 713, but that case is not dispositive of the

matter before us. In *Webster*, a teacher claimed that he was discriminated against based on his race when he was denied promotion to principal because he had been arrested and indicted for receiving stolen property. While the court did reject the teacher's claims, we note that, unlike the situation here, the teacher did not and could not claim that he had not engaged in the conduct upon which the charges against him were based. Those charges were ultimately dismissed not because they were untrue, but because the teacher had successfully moved to have the incriminating evidence suppressed on the grounds that it had been unlawfully seized. In addition, the court determined that the teacher had failed to establish the existence of a racially discriminatory pattern or practice within the meaning of Title VII. Without endorsing the Seventh Circuit's analysis, which Knight disputes, we simply observe again that that issue has not been properly raised in this litigation.

In its supplemental brief, SIU also cites *Batiste v. Burke* (5th Cir.1984), 746 F.2d 257. *Batiste* is even less relevant to this case than *Webster*. It involves a due process challenge to a hiring decision made by the United States Postal Service. While arrest records were involved, the decision had nothing whatever to do with Title VII or race discrimination.

SIU argues in the alternative that even if the allegations in the report of Knight's arrest are false and Knight's account is taken as true, it was nevertheless justified in not hiring him because he would still at least have been shown to have lied to the East St. Louis police when he told them that the revolver was his, when it was not. Such conduct, of course, cannot be taken lightly. To be sure, Knight's motives were good. He did not lie to evade criminal responsibility but to accept it in order to aid an injured friend. At the same time, we cannot condone behavior which might interfere with the effective administration of justice by allowing guilty persons to avoid lawful prosecution. There are, however, two major flaws in SIU's argument. First, while SIU had information regarding this lie available to it when it made its decision to refuse to hire Knight, there is no evidence that the information played any role in the decision. Second, SIU adduced no evidence to show how this single incident five years earlier might now impede Knight's ability to perform responsibly as a university police officer.

■ For the foregoing reasons, we hold that SIU has not sustained its burden of establishing that its consideration of Knight's record of arrest and conviction in refusing to hire him was justified by business necessity. The order of the Commission is amply supported

by the evidence.

Before concluding our discussion, there is one further matter we must discuss. Knight's attorney claims that the Commission made an inadvertent error with respect to the amount of attorney fees and costs his client was awarded. The record indicates, however, that this claim has been raised for the first time in Knight's brief on appeal. The issue has therefore been waived. In addition, no formal cross-appeal was taken by Knight regarding that portion of the Commission's order. Thus, even if the issue had not been waived, it would nevertheless not be properly before us. The judgment of the circuit court of Madison County upholding the order of the Commission is therefore affirmed.

Affirmed.

KARNS, P.J., concurs.

JUSTICE WELCH, dissenting:

I dissent and would reverse outright the decisions of the Commission and the circuit court. Their findings that the employment practice in question was not justified by business necessity are against the manifest weight of the evidence.

SIU's decision not to hire James Knight was not based upon the fact of his arrest, but upon the facts and circumstances surrounding that arrest, including the admitted fact that he had lied to an East St. Louis police officer conducting a criminal investigation. Also a consideration in SIU's decision was that, when Chief McDonald asked Knight about the incident, Knight gave an incredible response and stated that he would not have allowed the background check had he known SIU would learn of his prior arrest and conviction.

Knight was an applicant for the position of police officer. Unlike other work positions, this position combines aspects of both professionalism and significant public risk and responsibility. It has been held that,

> "when the job clearly requires a high degree of skill and the economic and human risks involved in hiring an unqualified applicant are great, the employer bears a corresponding-lighter burden to show that his employment criteria are job related. [Citation omitted.] The courts, therefore, should proceed with great caution before requiring an employer to lower his pre-employment standards for such a job." (*Spurlock v. United Airlines, Inc.* (10th Cir. 1972), 475 F.2d 216, 219.)

*Spurlock* has been approved by the Seventh Circuit Court of Appeals in *Hodgson v. Greyhound Lines, Inc.* (7th Cir. 1974), 499 F.2d 859 at 862-63, *cert. denied* (1975), 419 U.S. 1122, 42 L. Ed. 2d 822, 95 S. Ct. 805. The court in *Hodgson* stated that where the employee would be entrusted with "the lives and well-being" of the public, the employer "must continually strive to employ the most highly qualified persons available." 499 F.2d at 863.

A police officer who carries a firearm is entrusted with the lives and well-being of the public. He is in a position of public trust and must be both trustworthy and honest. One who employs an individual for such a position must be especially careful to employ only the most qualified applicants.

This case is unlike *City of Cairo v. Fair Employment Practices Comm'n* (1974), 21 Ill. App. 3d 358, 315 N.E.2d 344, in which the city had a policy of excluding all persons with arrest records from employment on the city's police force. SIU has no absolute bar against hiring individuals who have been arrested. Instead, each applicant is evaluated on a case-by-case basis, and, in fact, SIU has hired individuals as police officers who have had both arrest and conviction records.

Finally, SIU did conduct an investigation of the facts and circumstances surrounding Knight's arrest. Chief McDonald asked Knight for his version of the incident. Knight's explanation contradicted the police report, indicating that he had lied to the investigating officer or was lying to Chief McDonald. Chief McDonald found Knight's explanation confusing and incredible. Knight did not provide Chief McDonald with the names of any possible witnesses who could corroborate Knight's version when Chief McDonald asked for them. Chief McDonald also received a letter from the attorney who had represented Knight which indicated that Knight had owned the gun in question. Knight denied ownership of the gun.

Faced with the conflicting versions of the facts and circumstances surrounding Knight's arrest, the fact that Knight had either lied to the investigating officer or to Chief McDonald, and the fact that Knight was applying for a position as a police officer, a position of public trust, SIU's refusal to hire Knight was justified by business necessity.

I would therefore reverse.