# Illinois Official Reports

***Community Unit School District No. 5 v. Illinois Educational Labor Relations Board***,
**2014 IL App (4th) 130294**

| | |
|---|---|
| Appellate Court Caption | COMMUNITY UNIT SCHOOL DISTRICT NO. 5, McLEAN AND WOODFORD COUNTIES, ILLINOIS, Described in the Administrative Proceedings as McLean County Unit School District No. 5, a/k/a Board of Education of McLean County Unit District No. 5, Petitioner, v. THE ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD; and THE AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES (AFSCME), COUNCIL 31, Respondents. |
| District & No. | Fourth District<br>Docket No. 4-13-0294 |
| Filed<br>Rehearing denied | June 5, 2014<br>July 14, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The finding of the Illinois Educational Labor Relations Board that petitioner school district's decision to outsource its arrangements for student transportation services involved unfair labor practices against the union representing the bus drivers and monitors employed by the district at the time the decision was made was reversed by the appellate court on the ground that the decision was clearly erroneous, since the termination of the district's bus drivers and monitors was the result of *bona fide* and legitimate reasons, not antiunion animus, the district bargained in good faith with the union and there were no violations of the Illinois Educational Labor Relations Act. |
| Decision Under Review | Petition for review of order of Illinois Educational Labor Relations Board, No. 12-CA-43-S. |
| Judgment | Reversed. |

Counsel on Appeal

Robert B. McCoy, Patrick A. Murphey, and Dennis Triggs (argued), all of Miller, Hall & Triggs, LLC, of Peoria, for petitioner.

Gail E. Mrozowski (argued), of Cornfield & Feldman, of Chicago, for respondent American Federation of State, County, and Municipal Employees.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Sharon A. Purcell (argued), Assistant Attorney General, of counsel), for respondent Illinois Educational Labor Relations Board.

Stanley B. Eisenhammer and John L. DiJohn, both of Hodges, Loizzi, Eisenhammer, Rodick & Kohn LLP, of Arlington Heights, for *amicus curiae* Illinois Association of School Boards.

Panel

JUSTICE TURNER delivered the judgment of the court, with opinion. Justices Harris and Holder White concurred in the judgment and opinion.

**OPINION**

¶ 1     In April 2013, respondent, the Illinois Educational Labor Relations Board (IELRB), found petitioner, Community Unit School District No. 5, McLean and Woodford Counties, Illinois (District), engaged in unfair labor practices against respondent, the American Federation of State, County and Municipal Employees, Council 31 (AFSCME), with respect to its decision to contract with First Student, Inc. (First Student), for student transportation services. *American Federation of State, County, & Municipal Employees, Council 31*, 29 PERI ¶ 174 (IELRB 2013) (hereinafter, *McLean County*, 29 PERI ¶ 174).

¶ 2     On direct administrative review of the IELRB's order, the District argues (1) the IELRB had no jurisdiction over the parties, (2) the charges against it were preempted by the School Code (105 ILCS 5/1-1 *et seq.* (West 2010)), (3) the IELRB applied an incorrect standard of law in finding the District committed unfair labor practices, (4) the IELRB's findings were erroneous, and (5) the IELRB's remedy violated state and federal law. We reverse the IELRB's decision.

¶ 3                        I. BACKGROUND

¶ 4     On May 22, 2012, AFSCME filed an unfair-labor-practice charge with the IELRB against the District, alleging it violated sections 14(a)(1), 14(a)(3), and 14(a)(5) of the Illinois

Educational Labor Relations Act (Act) (115 ILCS 5/14(a)(1), (a)(3), (a)(5) (West 2010)). AFSCME alleged the District violated the Act by deciding to contract out school bus services in retaliation against the bus drivers and bus monitors for choosing AFSCME as their representative and by failing to bargain in good faith.

¶ 5    On June 15, 2012, the Executive Director of the IELRB issued a complaint and notice of hearing against the District, alleging it had engaged in unfair labor practices regarding its decision to subcontract student transportation work in violation of the Act. The Board of Education of Community Unit School District No. 5 (Board of Education) was not named as a respondent. The Executive Director indicated a hearing would take place on August 20 and 21, 2012, before an administrative law judge (ALJ).

¶ 6    On June 20, 2012, the District filed its answer and affirmative defenses. In part, the District argued the complaint for hearing failed to name the governing entity educational employer, *i.e.*, the Board of Education, as respondent under section 2(a) of the Act (115 ILCS 5/2(a) (West 2010)) and thereby failed to state a basis for relief. The District also asserted no service had been made upon the educational employer under section 2(a).

¶ 7    On June 25, 2012, the IELRB, by and through its counsel, the Attorney General, filed a verified complaint for injunctive relief and a petition for temporary restraining order and preliminary injunction in the circuit court against the District, seeking to enjoin the District from effectuating an agreement with First Student to subcontract the District's student transportation services.

¶ 8    On July 17, 2012, the District filed a motion for temporary or preliminary order of prohibition, seeking to prohibit the IELRB from taking any action on any administrative complaint or charges arising out of the District's decision to contract with First Student. On July 17 and 18, 2012, the circuit court held a hearing on the motions and granted the preliminary injunction. The court denied the District's motion for an order of prohibition and its motion for stay of the order granting the injunction.

¶ 9    On appeal, this court affirmed, finding the circuit court did not abuse its discretion in granting the petition for the preliminary injunction where the IELRB raised a fair question of an unfair labor practice by the District. *Illinois Educational Labor Relations Board v. Board of Education of Community Unit School District No. 5*, 2012 IL App (4th) 120690-U.

¶ 10   In August and September 2012, the ALJ conducted hearings on this matter. In January 2013, the ALJ issued her recommended decision and order with her findings of fact, which we will rely on in setting forth the facts that follow. *McLean County*, 29 PERI ¶ 174 (ALJ decision). Prior to October 2011, a meet-and-confer committee was certified by the IELRB as the exclusive bargaining representative of the bus drivers and bus monitors employed by the District. The District and the meet-and-confer committee were parties to a collective-bargaining agreement that expired in August 2011. In or around August 2011, the IELRB held a representation election between AFSCME and the meet-and-confer committee. On October 20, 2011, the IELRB issued an order and opinion certifying AFSCME as the exclusive bargaining representative of the approximately 215 bus drivers and bus monitors.

¶ 11   The District serves approximately 13,500 students in McLean and Woodford Counties in 25 different buildings. Due to the size of the District, most of these students must be transported to school. The District employed bus drivers and bus monitors as part of its in-house transportation department. The District considered subcontracting its transportation services in 2003 and 2009. In 2009, the District contracted with an outside consultant, who

ultimately recommended the District contract out bus services. However, the District did not do so at that time.

¶ 12 State funding had decreased by 23% during the three years prior to the hearing. At the same time, district enrollment had increased, which created a greater demand for transportation services. As the District grew, the District's transportation department experienced difficulty in hiring drivers to cover all the routes. In addition, absenteeism became a problem. A lack of staffing led to frequent late buses and occasional drop-off violations. The District employed 8 to 10 substitute drivers to fill in for absent drivers, but often there were too many open routes for the substitute drivers to cover. Prior to October 2011, the District's practice was to use office personnel and bus mechanics with school bus permits to cover bus routes that were not staffed due to absences and driver shortages. However, this arrangement resulted in less time for mechanics to maintain buses.

¶ 13 In 2010 and 2011, District administrators and the Board of Education regularly received complaints from parents and the public regarding the District's transportation services. Board of Education member Gail Briggs testified she heard complaints about students' late arrival at school, students missing class time, students not arriving home on time, and students dropped off at the wrong places. Although this was not the first time the transportation department had experienced problems, the testimony indicated the problems in 2011 were more severe than in prior years. In October 2011, District superintendent Gary Niehaus asked for and received from the Board of Education authority to spend up to $500,000 in emergency busing services. The District subsequently contracted out a portion of its transportation services to Illinois Central School Bus Company to avoid having to use other employees to cover bus routes.

¶ 14 In October 2011, Renee Nestler, AFSCME's staff representative, sent the Board of Education a demand to bargain a new collective-bargaining agreement for the bus drivers and bus monitors. In December 2011, Nestler received a phone message from Dennis Triggs, the Board of Education's outside counsel, informing her that the District was considering the possibility of outsourcing the entire transportation department. Nestler later sent a letter to Triggs demanding to bargain over the decision. Nestler then spoke with Curt Richardson, the District's in-house counsel, who informed her the District was considering outsourcing the entire transportation department because of operational issues, including absenteeism, turnover, and frequent late buses. Richardson also informed Nestler that economics were not the primary reason the District was considering outsourcing. Nestler stated AFSCME wished to bargain over the District's decision to outsource.

¶ 15 The parties met for negotiations on December 12, 2011. When asked the reason behind the District's decision to consider subcontracting the entire transportation department, Triggs answered the decision was based on operational concerns, including attendance, turnover, and retention of drivers. Triggs also stated the District's administration spent a disproportionate amount of time dealing with the transportation department. On December 14, 2011, the Board of Education unanimously adopted a resolution authorizing and directing the superintendent to solicit bids for third-party transportation services to address the operational issues and determine any cost savings. The resolution noted the excessive absenteeism and turnover of bus drivers and that the District experienced reductions in reimbursable state transportation payments. The following day, Nathaniel Cunningham, the District's assistant superintendent of human resources, issued a memorandum to transportation department employees informing them the District would be soliciting bids for third-party transportation services.

¶ 16 The parties met for another negotiation session on or about January 12, 2012, and discussed the District's reasons for exploring outsourcing all transportation services. Niehaus referred to operational problems such as attendance, driver shortages, late buses, and missed stops. With regard to bargaining for a collective-bargaining agreement, AFSCME submitted two additional noneconomic proposals. The parties met again on or about January 26, 2012, and the District presented a proposal regarding attendance and absences.

¶ 17 On January 31, 2012, the District issued bid documents for student transportation services. On February 6, 2012, Richardson contacted Nestler to inform her the District was conducting a mandatory prebid meeting later that day. The purpose of the meeting was to allow companies interested in bidding to acknowledge themselves and have their questions answered. Nestler attended, as did representatives from other vendors, including First Student and Durham School Services (Durham).

¶ 18 On February 9, 2012, the parties held a negotiation session and bargained over discipline issues. On February 14, 2012, Nestler sent a letter to Triggs asking him to clarify and be more specific with respect to statements made during bargaining concerning the District's reasons for considering the contracting out of transportation services. AFSCME did not receive a written response.

¶ 19 On March 1, 2012, the District indicated it received no bids and indicated it would seek out another bid. On March 7, 2012, the parties met for a negotiation session and discussed prior noneconomic proposals.

¶ 20 On March 15, 2012, the District again issued bid documents for student transportation services. In contrast to the first request for proposal, the second requested a three-year contract.

¶ 21 On March 22, 2012, the parties met for another bargaining session. AFSCME presented a proposal for a grievance procedure. The District informed AFSCME it was anxious to see the union's economic proposal before the next meeting. Nestler inquired whether Triggs would be responding in writing to the letter she sent on February 4, 2012, and Triggs responded the District had already responded to the matters inquired about in the letter.

¶ 22 On April 2, 2012, bids were received from First Student and Durham. On or about April 5, 2012, AFSCME presented its first economic proposal to the District. AFSCME proposed that starting wages for bus drivers be increased from $10.50 per hour to $13.50 per hour with a $.50 increase for each year of seniority. AFSCME proposed the wage increases would be retroactive to August 2011 and that, over the contract duration of three years, employees would receive a 3% increase in the second and third years. AFSCME proposed that drivers maintain the health coverage that was provided by the District and that monitors be given the option of health insurance. The proposal also included a provision that the drivers and monitors continue to complete their own time cards instead of using a time clock. AFSCME also proposed attendance and recruitment incentives to discourage absenteeism and improve staffing.

¶ 23 In the meantime, the District continued to consider the possibility of outsourcing. After evaluating the bids, Erik Bush, the District's business manager, recommended that Niehaus forward to the Board of Education a recommendation to contract with First Student. Bush estimated that First Student's bid would cost approximately $1.5 million less over a three-year period than AFSCME's current operating costs. On April 11, 2012, the Board of Education held a public hearing on the issue of outsourcing the entire transportation department. Based on the staff recommendation and the estimated cost savings, the Board of Education authorized the superintendent to enter into negotiations with First Student.

¶ 24     The bid documents did not commit the District to enter into a contract for transportation services, and negotiations continued between the District and AFSCME. On April 27, 2012, the parties met to discuss cost figures. The District presented a document comparing AFSCME's April 5 economic proposal with the District's current transportation operating costs and with First Student's bid proposal. The District estimated First Student's proposal would cost approximately $1.5 million less over a three-year period than the District's current operating costs. In contrast, the District estimated AFSCME's April 5 economic proposal would cost approximately $2 million more over a three-year period than the District's current operating costs.

¶ 25     On or about May 7, 2012, the parties met for another bargaining session. Triggs stated that even if AFSCME agreed to a two-year wage freeze and the elimination of health-insurance benefits for all drivers and monitors, the deal would still cost more than First Student's bid. Nestler testified Triggs stated a wage freeze and elimination of health insurance "would not get us there," implying that it would still not be comparable to First Student. The District indicated that even if AFSCME was willing to accept those terms, the operational problems would still exist and the District would still consider outsourcing.

¶ 26     On May 16, 2012, AFSCME presented a revised economic proposal to the District. AFSCME reduced its original proposed starting salary for bus drivers and bus monitors by 50 cents. AFSCME also proposed an attendance incentive of $25 if an employee works the full day before and after a scheduled holiday or vacation break. To address hiring difficulties, AFSCME proposed a recruitment incentive of $200 to any employee for the successful recruitment of a new bus driver who stays for three months. Triggs asked whether the revised economic proposal was AFSCME's best proposal and informed AFSCME that the District was getting close to making a decision whether to outsource. Kent Beauchamp, AFSCME's regional director, informed Triggs that AFSCME had a meeting with its membership scheduled for May 21.

¶ 27     On May 18, 2012, Triggs sent a letter to Nestler requesting AFSCME provide the District with AFSCME's best offer as soon as possible so the District could compare it with First Student's bid. On May 22, 2012, Nestler responded, stating AFSCME was not a company bidding for the District's business and its members were not employees of a third party such that they deserved greater consideration than the District was giving them. On that same date, AFSCME filed its unfair-labor-practice charge with the IELRB against the District.

¶ 28     At a bargaining meeting on May 29, 2012, AFSCME submitted a proposal that removed a prior proposal that employees could waive health insurance and be paid $2,000 but not its proposal to provide coverage at employer expense to all monitors. It also reduced its demand for vacation and holiday pay that none of the employees then had but made no movement on wages or other items. In response, Triggs reiterated that it was close to making a decision on outsourcing and the District needed AFSCME's best offer.

¶ 29     On June 3, 2012, Nestler indicated in a letter that AFSCME's proposal would not be its final offer. Nestler contended the District's position was not consistent with its obligation to bargain in good faith. On June 4, 2012, Triggs replied, in part, as follows:

        "We are confident that we have met the obligations imposed upon us by law. We have never declared that the only way to resolve the operational problems experienced by the District is to outsource. Nor have we declared that AFSCME cannot make an economic proposal that would dissuade the Board of Education from outsourcing. We

- 6 -

do understand that the advantages to the District of the proposal presented by First Student's bid presents a unique problem for AFSCME. Nevertheless, we will once again come to the table tonight with an open mind."

¶ 30    Thereafter, the parties met for another bargaining session. AFSCME presented a revised economic proposal in which it agreed to forgo retroactive wage increases. In lieu of the retroactive pay, AFSCME proposed a $1,000 signing bonus for each employee who was employed on August 18, 2011, and returned to work on August 22, 2012. By withdrawing its request for retroactive wage increases, AFSCME reduced the cost of its proposal by $613,000. AFSCME also withdrew its proposal for paid vacation for its members. While the proposal reduced AFSCME's costs, it still left the proposal over $4 million higher than that of First Student and over $2.5 million more than the District's costs for the same three years without the improvements demanded by AFSCME. After reviewing the proposal, the District's representatives asked if the June 4 proposal was AFSCME's best offer. When AFSCME's representatives answered no, the District's representatives asked why it was not its best proposal. Nestler explained that AFSCME's membership found what was currently on the table on the District's side to be unacceptable.

¶ 31    The District informed AFSCME that its June 4 proposal would be compared to First Student's bid the following day at the Board of Education meeting. Niehaus testified the decision on outsourcing had to be made on June 5 due to the timing of the start of the school year, as the District had to give First Student adequate time to plan routes.

¶ 32    On June 5, 2012, the Board of Education unanimously adopted a resolution approving student transportation services with First Student. Niehaus testified he recommended the Board of Education contract with First Student due to the projected savings to the District and because of First Student's experience in providing transportation services. Briggs testified she voted in favor of the resolution based on past problems with transportation services and the estimated cost savings over the District's current operating costs. Board of Education President John Puzauskas testified he voted in favor of the resolution because he believed First Student could provide superior management due to its expertise in the field. Both Briggs and Puzauskas noted the estimated savings of $1.5 million over a three-year period was also a significant factor in the decision. The resolution stated First Student must offer available employee positions to qualified district employees whose employment is terminated because of the outsourcing and pay those employees comparable wages and benefits.

¶ 33    After the June 5 meeting, Nestler received a copy of the signed contract with First Student. Thereafter, AFSCME sent a letter to First Student demanding to bargain over wages, hours, and working conditions. On July 11, 2012, the Board of Education adopted a resolution honorably dismissing all transportation department employees.

¶ 34    In addressing the alleged violations of sections 14(a)(1) and 14(a)(3) of the Act, the ALJ found the bus drivers and bus monitors were engaged in protected union activity when they chose AFSCME as their exclusive bargaining representative. Aware of this activity, the District took adverse action against the bus drivers and monitors when it subcontracted out transportation services in June 2012 and discharged the employees in July 2012. The ALJ found the District "acted with anti-union animus when it subcontracted out transportation services and discharged members of [AFSCME's] bargaining unit." *McLean County*, 29 PERI ¶ 174, at 881 (ALJ decision). The ALJ found the District's conduct "was inherently destructive of employee rights" and "had a long-term debilitating effect on the employees' right to select

and be represented by a union." *Id.* Further, even the District's legitimate objective of operational concerns would "not erase the strong inference that [the District] intended to discourage the employees' exercise of their statutory rights." *Id.*

¶ 35    The ALJ noted the District's argument that it decided to subcontract transportation services due to the significant costs savings. The ALJ, however, found the District's contention lacked "legitimacy because it was not even proffered by [the District] until April 2012 when it received First Student's bid, four months after [the District's] initial decision to solicit bids for transportation services." *Id.* at 882.

¶ 36    The ALJ also found the District violated sections 14(a)(1) and 14(a)(5) of the Act, stating the District failed to bargain in good faith or to impasse regarding its decision to outsource. The ALJ found that, although the parties had engaged in negotiations, the District did not bargain in good faith after learning of the cost savings to be achieved by contracting with First Student. The ALJ concluded the District "improperly and unfairly used First Student's bid to gain bargaining power over [AFSCME] and force[d] [AFSCME] to bargain against itself." *Id.* at 884.

¶ 37    In January 2013, the District filed timely exceptions to the ALJ's recommended decision and order, alleging errors with respect to the merits, jurisdiction, and the proposed remedies. In April 2013, the IELRB adopted the ALJ's findings and affirmed the recommended decision and order. The IELRB ordered the District to rescind its June 2012 decision to enter into a contract with First Student and, upon request, bargain collectively in good faith and to decision or impasse with AFSCME over the decision to subcontract transportation services. *McLean County*, 29 PERI ¶ 174. Thereafter, the District petitioned for direct administrative review of the IELRB's final order. See 115 ILCS 5/16(a) (West 2012).

¶ 38    Prior to beginning our analysis, we note the record in this case consists of over 3,600 pages and 31 volumes. The District, AFSCME, the Illinois Attorney General, and the Illinois Association of School Boards as *amicus* have filed lengthy briefs setting forth their arguments. In those briefs, the parties have stated facts with reference to the pages of the record. We would encourage the parties, especially in cases involving such a voluminous record, to also include the corresponding volume numbers where those pages can be found, thereby allowing this court quick access to the cited materials.

¶ 39                                    II. ANALYSIS
¶ 40                                   A. Jurisdiction
¶ 41    The District argues the IELRB lacks subject-matter jurisdiction, where the District is not an educational employer, and also personal jurisdiction over the educational employer (the Board of Education), where service was not obtained on the Board of Education. We find the IELRB had jurisdiction over the unfair-labor-practice charges in this case.

¶ 42    "[I]n the administrative law context, the term 'jurisdiction' has three aspects: (1) personal jurisdiction (*i.e.*, the agency's authority over the parties and intervenors involved in the proceedings); (2) subject-matter jurisdiction (*i.e.*, the agency's power over the general class of cases to which the particular case belongs); and (3) an agency's scope of authority under its statute." *Armstead v. Sheahan*, 298 Ill. App. 3d 892, 895, 700 N.E.2d 149, 151 (1998).

¶ 43    In the case *sub judice*, AFSCME's May 22, 2012, charge of unfair labor practices named McLean County District No. 5 as respondent, as did the complaint for hearing. The Board of

Education was not named as a respondent or served with the charge or complaint. In its June 2012 answer, the District denied it is an educational employer, stating it is an Illinois school district and the Board of Education is the governing entity and educational employer under the School Code. The District's first affirmative defense stated no service had been made upon the educational employer.

¶ 44    At the August 2012 hearing before the ALJ, AFSCME made a verbal motion to amend the complaint to change the status of respondent, claiming the charge and the complaint contained a misnomer. After reserving ruling on the issue, the ALJ granted the motion to amend, stating she would add to the caption McLean County Unit District No. 5, a/k/a Board of Education of Unit District 5, and thus "the Respondent now has notice of that." See generally *McLean County*, 29 PERI ¶ 174, at 879 (ALJ decision).

¶ 45    In its April 2013 opinion and order, the IELRB disagreed with the District's contention that the matter should be dismissed because the charge and complaint named the District instead of the Board of Education. The IELRB found the misnomer of a respondent is not sufficient grounds for dismissal and it had the authority to correct the name of a party at any time. 80 Ill. Adm. Code 1105.110(b) (2004). Further, the IELRB found respondent replied to the unfair-labor-practice charge, filed an answer, appeared at the hearing, filed a posthearing brief, and filed exceptions to the ALJ's order. Thus, the IELRB concluded respondent had actual notice of the proceedings and was not prejudiced in any way by the misnomer. *McLean County*, 29 PERI ¶ 174, at 870.

¶ 46    Here, the IELRB has the authority to decide charges of unfair labor practices, giving it subject-matter jurisdiction over the case. The District argues the IELRB lacked personal jurisdiction over the Board of Education because service was not obtained on it. However, the Board of Education cannot be said to have lacked notice in this case. It cannot claim it was surprised at the hearing or that its ability to present a defense was prejudiced. Its position was considered at every stage of this dispute, and we find the IELRB properly exercised jurisdiction in this matter.

¶ 47                                B. School Code

¶ 48    The District argues section 10-22.34c of the School Code (105 ILCS 5/10-22.34c (West 2010)) divests the IELRB of jurisdiction over this matter or, in the alternative, the School Code defines and limits the scope of a board of education's responsibilities under the Act with respect to outsourcing student transportation services. We disagree.

¶ 49    Section 10-22.34c of the School Code permits a board of education to enter into contracts with third parties "for non-instructional services currently performed by any employee or bargaining unit member or lay off those educational support personnel employees upon 90 days written notice to the affected employees," provided certain procedures and safeguards are followed. 105 ILCS 5/10-22.34c(a) (West 2010). Those procedures and safeguards include, *inter alia*, (1) the outsource contract cannot be entered into and become effective during the term of an existing collective-bargaining agreement; (2) bidders on the outsource contract must offer comparable benefits to those provided to school board employees who perform the same duties; (3) a public hearing; and (4) the contractor must offer available employee positions to qualified school district employees whose employment is terminated by the contract. 105 ILCS 5/10-22.34c(a) (West 2010).

¶ 50    Subsection 10-22.34c(b) of the School Code (105 ILCS 5/10-22.34c(b) (West 2010)) permits a board of education to enter into a contract, not to exceed three months in length, "in an emergency situation that threatens the safety or health of the school district's students or staff, *provided that the school board meets all of its obligations under the Illinois Educational Labor Relations Act*." (Emphasis added.)

¶ 51    The District argues the emphasized language in subsection 10-22.34c(b) mentioning the Act indicates the General Assembly "implicitly excluded from that Act a board of education's decision to outsource work, on a non-emergency basis where no collective bargaining agreement exists, even where that work is currently performed by bargaining unit members." Thus, the District contends the Act cannot apply to outsourcing decisions made pursuant to subsection 10-22.34c(a) and the IELRB has no jurisdiction over this matter.

¶ 52    We find the District's argument unconvincing. The IELRB has jurisdiction over the matters contained in the Act, including any conduct by an educational employer that is alleged to have violated the Act, such as an unfair labor practice. The School Code, however, does not contain language that shows it controls over the Act. On the contrary, section 17 of the Act provides, in part, as follows: "In case of any conflict between the provisions of this Act and any other law ***, the provisions of this Act shall prevail and control." 115 ILCS 5/17 (West 2010); see also *Board of Education, Granite City Community Unit School District No. 9 v. Sered*, 366 Ill. App. 3d 330, 338, 850 N.E.2d 821, 829 (2006) (stating "where any other law conflicts with the Act, the Act controls"). Thus, we find the IELRB had jurisdiction over this matter.

¶ 53                              C. The IELRB's Findings

¶ 54    The District argues the IELRB's finding that the District violated section 14(a)(3) and, derivatively, section 14(a)(1) of the Act, was clearly erroneous as the IELRB misapplied the law to the facts in this case. We agree.

¶ 55                              1. *Standard of Review*

¶ 56    Our supreme court has noted "judicial review of an IELRB decision is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq*. (West 1994)) and extends to all issues of law and fact presented by the record." *SPEED District 802 v. Warning*, 242 Ill. 2d 92, 111, 950 N.E.2d 1069, 1080 (2011). When issues of law are involved, we review the IELRB's findings *de novo*; while its findings on issues of fact will be deemed *prima facie* correct unless they are against the manifest weight of the evidence. *SPEED District 802*, 242 Ill. 2d at 111-12, 950 N.E.2d at 1080.

> " '[T]he clearly erroneous standard of review is proper when reviewing a decision of the IELRB or the ILRB because the decision represents a mixed question of fact and law. [Citation.] An agency decision will be reversed because it is clearly erroneous only if the reviewing court, based on the entirety of the record, is " 'left with the definite and firm conviction that a mistake has been committed.' " [Citation.] While this standard is highly deferential, it does not relegate judicial review to mere blind deference of an agency's order.' " *SPEED District 802*, 242 Ill. 2d at 112, 950 N.E.2d at 1080-81 (quoting *Board of Trustees of the University of Illinois v. Illinois*

*Educational Labor Relations Board*, 224 Ill. 2d 88, 97-98, 862 N.E.2d 944, 950-51 (2007)).

¶ 57                              2. *Sections 14(a)(1) and 14(a)(3) of the Act*

¶ 58        AFSCME filed an unfair-labor-practice charge with the IELRB against the District, alleging it violated sections 14(a)(1) and 14(a)(3) of the Act. 115 ILCS 5/14(a)(1), (a)(3) (West 2010). The ALJ found the District violated section 14(a)(3) and, derivatively, section 14(a)(1), by entering into a contract for transportation services with First Student and discharging AFSCME's members in retaliation for their union activity. The IELRB agreed.

¶ 59        Sections 14(a)(1) and 14(a)(3) of the Act provide as follows:
    "(a) Educational employers, their agents or representatives are prohibited from:
        (1) Interfering, restraining or coercing employees in the exercise of the rights guaranteed under this Act.
          ***
        (3) Discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any employee organization." 115 ILCS 5/14(a)(1), (a)(3) (West 2010).

¶ 60        Our supreme court has noted "section 14(a)(1) refers to adverse action taken against an employee as a result of any protected concerted activity, while section 14(a)(3) refers specifically to discrimination based on union activity." *SPEED District 802*, 242 Ill. 2d at 112, 950 N.E.2d at 1081. Thus, where an alleged violation of section 14(a)(1) is based on the same conduct alleged in a section 14(a)(3) violation, "the section 14(a)(1) violation is essentially a derivative violation." *Bloom Township High School District 206 v. Illinois Educational Labor Relations Board*, 312 Ill. App. 3d 943, 957, 728 N.E.2d 612, 623 (2000); see also *SPEED District 802*, 242 Ill. 2d at 113, 950 N.E.2d at 1081.
    "In such cases, the test to be applied is the one used to determine whether a section 14(a)(3) violation occurred. [Citation.] A *prima facie* case of a section 14(a)(3) violation requires proof that the employee was engaged in activity protected by section 14(a)(3); that the District was aware of that activity; and that the employee was discharged for engaging in that protected (union) activity. [Citation.] The third part of the test is established if the employee's protected activity was a substantial or motivating factor for the discharge or other adverse action taken against the employee. [Citation.] Since motive is a question of fact, a Board's finding as to motive can only be set aside if it is against the manifest weight of the evidence. [Citations.] However, even if a *prima facie* showing has been made, there can be no finding that an unfair labor practice occurred if the employer can demonstrate, by a preponderance of the evidence, that the adverse action would have occurred notwithstanding the protected activity." *SPEED District 802*, 242 Ill. 2d at 113, 950 N.E.2d at 1081.

¶ 61        In this case, the bus drivers and bus monitors were engaged in protected activity when they chose AFSCME as their exclusive collective-bargaining representative, and the District was aware of this activity. Thus, the question becomes whether the employees were discharged for engaging in that protected union activity.
        "Where an employer is charged with an unfair labor practice because of the discharge of an employee engaged in protected activity, the charging party must first

show, by a preponderance of the evidence, that the adverse employment action was 'based in whole or in part on antiunion animus–or *** that the employee's protected conduct was a substantial or motivating factor in the adverse action.' [Citation.] Since motive is a question of fact, the Board may infer discriminatory motivation from either direct or circumstantial evidence, and, because motive involves a factual determination, the Board's finding must be accepted if supported by substantial evidence. [Citation.] Antiunion motivation may reasonably be inferred from a variety of factors, such as an employer's expressed hostility towards unionization, together with knowledge of the employee's union activities [citation], proximity in time between the employees' union activities and their discharge [citation], disparate treatment of employees or a pattern of conduct which targets union supporters for adverse employment action [citations], inconsistencies between the proffered reason for discharge and other actions of the employer [citation], and shifting explanations for the discharge [citations]." *City of Burbank v. Illinois State Labor Relations Board*, 128 Ill. 2d 335, 345-46, 538 N.E.2d 1146, 1149-50 (1989).

¶ 62    Here, the ALJ found the District took adverse action against the bus drivers and monitors and acted with antiunion animus when it subcontracted out transportation services in June 2012 and discharged the employees in July 2012. *McLean County*, 29 PERI ¶ 174, at 881 (ALJ decision). In support of its finding of antiunion animus, the ALJ relied on the timing of the District's decision, stating the District's decisions to subcontract a portion of its transportation services and then solicit bids for all of those services occurred within months of AFSCME's certification. *Id.* Further, the ALJ noted evidence demonstrated there were other periods of time when the transportation department experienced operational problems. Although the District considered outsourcing as early as 2003, the ALJ found the District did not make the decision to outsource until AFSCME became the exclusive representative of the bus drivers and monitors. *Id*. The ALJ also found the District's conduct was inconsistent in that it expressed concern about the operational problems in the transportation department but did little to address those problems. *Id.* Last, the ALJ found the District exhibited animus against AFSCME as evidence of its more favorable treatment of food-service employees who had retained a meet-and-confer committee as their bargaining representative. *Id.* at 881-82. The IELRB agreed with the ALJ's reasoning. *McLean County*, 29 PERI ¶ 174, at 871.

¶ 63    We find the evidence does not support the IELRB's conclusion of antiunion animus on the part of the District. The evidence does not support the District had viable alternatives to outsourcing or that it did little to address the transportation problem. Instead, the evidence showed District administrators responded to a growing problem by meeting with the union, reassigning staff and mechanics to driving duty, and entering into emergency subcontracting for transportation services. Also, the evidence failed to show the situation with the District's other employees, including its food-service employees, was in any way comparable or relevant. A finding of antiunion animus on this ground was comparing apples and oranges, where the food-service employees had a noncertified committee and the District did not experience widespread operational problems with its food services.

¶ 64    While the evidence failed to show inconsistencies or disparate treatment on the part of the District, the ALJ's and IELRB's main reliance on the timing factor also failed to establish a *prima facie* case of a section 14(a)(3) violation. The IELRB has stated "[t]he timing of the action, even though arguably suspect, standing alone and unsupported by statements,

documents, or data to suggest, at least in part, a desire to frustrate union organization or an anti-union animus is not sufficient to establish a prima facie case warranting the issuance of an unfair labor practice complaint." *Lake Zurich School District No. 95*, 1 PERI ¶ 1031, at 67 (IELRB 1984); see also *Bloom Township*, 312 Ill. App. 3d at 959, 728 N.E.2d at 625 (stating "proximity in time is insufficient by itself to sustain an unfair labor practice charge"); see also *Hardin County Education Ass'n v. Illinois Educational Labor Relations Board*, 174 Ill. App. 3d 168, 185, 528 N.E.2d 737, 747 (1988).

¶ 65 Although the District had considered outsourcing as far back as 2003, the evidence clearly established that the transportation department's problems had significantly worsened over the years. The record includes 6 bound volumes consisting of over 1,000 pages of complaints from concerned, and sometimes irate, parents regarding late buses and the unprofessional conduct of bus drivers and monitors. The District was prohibited from entering into a contract for transportation services during the term of the collective-bargaining agreement (105 ILCS 5/10-22.34c(a)(1) (West 2010)), and it had only a limited window of time to address the growing problem. As with the other factors cited by the ALJ, the timing factor fails to support an unfair-labor-practice charge in this case.

¶ 66 Even if it could be said that a *prima facie* case was established based on the employees' engagement in protected activity, the District's awareness of that activity, and the employees' discharge based on engaging in union activity, the District put forth a legitimate business reason for the adverse employment action.

"Once the charging party has established a [*prima facie*] case of discharge based in part on antiunion animus, the employer can avoid a finding that it violated the statute by demonstrating that the discharged employee would have been fired for a legitimate business reason notwithstanding the employer's antiunion animus. [Citations.] Merely proffering a legitimate business reason for the adverse employment action does not end the inquiry, for it must be determined whether the reasons advanced are *bona fide* or pretextual. If the suggested reasons are a mere litigation figment or were not relied upon, then the determination of pretext concludes the inquiry. [Citation.] However, where the employer advances legitimate reasons for the discharge and is found to have relied upon them in part, then the case is characterized as one of 'dual motive' and the employer must demonstrate by a preponderance of the evidence that the employee would have been terminated notwithstanding his union involvement." *City of Burbank*, 128 Ill. 2d at 346-47, 538 N.E.2d at 1150.

¶ 67 It is undisputed the District demonstrated it had legitimate reasons for outsourcing the transportation department. The ALJ even conceded the District's concerns about operational issues were legitimate. *McLean County*, 29 PERI ¶ 174, at 882 (ALJ decision). The Board of Education made formal findings of fact after a public hearing on why the contract was in the District's best interest. The Board of Education noted the District had experienced an excessive amount of absences in the transportation department along with other issues that caused District administrators and staff "to spend an exorbitant amount of time responding to parental complaints and dealing with day to day operational issues." Further, the Board of Education noted the bid from First Student would save $1.5 million for the District over the proposal offered by AFSCME.

¶ 68 The reasons proffered by the District were legitimate and *bona fide*. The ALJ found the cost savings lacked legitimacy because it was not proffered by the District until April 2012

when it received First Student's bid and the District did not establish it was experiencing significant financial problems. *Id*. We disagree with this reasoning. The District could not have known the amount of cost savings before it solicited and opened bids in April 2012. Moreover, it goes without saying that the State of Illinois is currently experiencing dire financial problems. The District has an obligation to be good fiscal stewards when it comes to costs, and a finding that significant cost savings lack legitimacy is oblivious to the current financial situation of this state and its effect on school districts. The evidence is also clear that the decision to terminate the employment of the bus drivers and monitors would have occurred notwithstanding their union activity.

¶ 69    In finding a lack of a legitimate business reason for the District's actions, the ALJ and the IELRB found the District's conduct "was inherently destructive of employee rights" under *Carmi Education Ass'n*, 6 PERI ¶ 1020 (IELRB 1990). *McLean County*, 29 PERI ¶ 174, at 881 (ALJ decision); see also *McLean County*, 29 PERI ¶ 174, at 871. In that case, the IELRB held that "[i]f the employer's conduct was 'inherently destructive' of employee rights, its proof of a legitimate objective may not erase the strong inference that the employer intended to discourage or encourage the employees' exercise of their statutory rights." *Carmi Education Ass'n*, 6 PERI ¶ 1020. Moreover, "[i]f the employer establishes important lawful objectives for its actions and tailors its conduct not to needlessly impinge on the exercise of statutory rights, the resulting infringement on the employees' rights may be unavoidable and warranted." *Id*. "Whether the employer's discriminatory treatment of its employees is inherently destructive or comparatively slight in its effect on the exercise of employee rights depends in large measure on whether there will be a long-term debilitating effect on the employee right to select and be represented by a union." *Id*.

¶ 70    The ALJ found the District's action resulted in the discharge of all bus drivers and monitors and "effectively [AFSCME's] bargaining unit ceased to exist." *McLean County*, 29 PERI ¶ 174, at 881 (ALJ decision). The ALJ concluded the District's action "clearly had a long-term debilitating effect on the employees' right to select and be represented by a union" and "even proof of a legitimate objective will not erase the strong inference that [the District] intended to discourage the employees' exercise of their statutory rights." *Id.*

¶ 71    We note the "inherently destructive" theory has not been adopted by Illinois courts in this type of case. Moreover, if such a theory were permitted, every decision by an employer to subcontract work could be labeled "inherently destructive," since such decisions deprive work to whole groups of employees. An employer would be foolish to even explore outsourcing because any decision could be found to be "inherently destructive" and thus lead to an unfair-labor-practice charge.

¶ 72    It should be noted the bargaining unit did not cease to exist in this case. AFSCME contacted First Student and demanded that First Student negotiate with it as the employees' exclusive bargaining representative. Thus, the union activity of the bus drivers and monitors continues despite the District's decision to subcontract. Moreover, the student transportation services agreement between the Board of Education and First Student required First Student to offer comparable wages and benefits to qualified employees pursuant to section 10-22.34c of the School Code (105 ILCS 5/10-22.34c(a)(3)(B) (West 2010)).

¶ 73    We also note *Carmi Education Ass'n* is easily distinguishable under the current set of facts. Rather than a decision to outsource all transportation jobs, that case involved a school district's conduct in treating nonstriking teachers more favorably than striking teachers. *Carmi*

*Education Ass'n*, 6 PERI ¶ 1020; see also *Wapella Education Ass'n v. Illinois Educational Labor Relations Board*, 177 Ill. App. 3d 153, 166, 531 N.E.2d 1371, 1379 (1988) (explaining that an " 'inherently destructive' " contract is one where its provisions create a division between union and nonunion workers by offering them different terms). Moreover, subcontracting of bargaining unit work is not "inherently destructive" of employees' rights but is both an inherent managerial right and an economic weapon of self-help. See *P.W. Supermarkets, Inc.*, 269 N.L.R.B. 839, 840 (1984) (stating "it would not appear that an employer's decision to subcontract work is itself an act inherently destructive of important employee rights").

> "Employees may believe that the collective bargaining process has extracted concessions from the employer that have made the employer's labor costs high enough to increase the likelihood the employer will subcontract. But that risk is omnipresent for employees who engage in collective bargaining. 'Indeed, anytime a union secures economic gains through the collective bargaining process, it runs the calculated risk that the increased costs may eventually compel the employer to adopt cost-motivated changes such as layoffs or subcontracting.' " *International Paper Co. v. National Labor Relations Board*, 115 F.3d 1045, 1050 (D.C. Cir. 1997) (quoting *P.W. Supermarkets*, 269 N.L.R.B. at 841).

Thus, an employer's ability to outsource, or threaten outsourcing, is part of the bargaining process and an important weapon in negotiations.

¶ 74    We find the IELRB's reliance on *Carmi* inappropriate in this case. The evidence fails to show the District acted with antiunion animus in terminating the employment of the bus drivers and monitors. Moreover, the District's reasons for doing so were *bona fide* and legitimate. As such, we are left with the definite and firm conviction that a mistake was committed by the IELRB and thus find the IELRB's decision that the District committed an unfair labor practice under section 14(a)(3) of the Act was clearly erroneous.

¶ 75                        3. *Section 14(a)(5) of the Act*

¶ 76    AFSCME's unfair-labor-practice charge against the District also alleged a violation of section 14(a)(5) of the Act. 115 ILCS 5/14(a)(5) (West 2010). The ALJ found the District violated section 14(a)(5) and, derivatively, section 14(a)(1), by unilaterally entering into a contract to subcontract all of its transportation services. *McLean County*, 29 PERI ¶ 174, at 883 (ALJ decision). The IELRB affirmed the ALJ's recommended decision and order.

¶ 77    In setting forth grounds for an unfair-labor-practice charge, section 14(a)(5) of the Act provides as follows:

> "(5) Refusing to bargain collectively in good faith with an employee representative which is the exclusive representative of employees in an appropriate unit ***." 115 ILCS 5/14(a)(5) (West 2010).

¶ 78    Sections 4 and 10 of the Act require educational employers to engage in collective bargaining with respect to "wages, hours and terms and conditions of employment" of educational employees. 115 ILCS 5/4 (West 2010); see also 115 ILCS 5/10(a) (West 2010). Employers are not "required to bargain over matters of inherent managerial policy, which shall include such areas of discretion or policy as the functions of the employer, standards of

services, its overall budget, the organizational structure and selection of new employees and direction of employees." 115 ILCS 5/4 (West 2010).

¶ 79    In *Central City Education Ass'n v. Illinois Educational Labor Relations Board*, 149 Ill. 2d 496, 599 N.E.2d 892 (1992), our supreme court adopted a three-part test for determining whether a matter is a mandatory subject of collective bargaining under section 4 of the Act. Step one of the *Central City* test considers whether the issue "is one of wages, hours and terms and conditions of employment." *Central City*, 149 Ill. 2d at 523, 599 N.E.2d at 905. If it does not, the employer need not bargain over it and the analysis is complete. *Central City*, 149 Ill. 2d at 523, 599 N.E.2d at 905. If the issue does involve wages, hours, and terms and conditions of employment, the second step is to determine whether the issue is one of inherent managerial authority. *Central City*, 149 Ill. 2d at 523, 599 N.E.2d at 905. If the answer is no, "the analysis stops and the matter is a mandatory subject of bargaining." *Central City*, 149 Ill. 2d at 523, 599 N.E.2d at 905. If the answer is yes, the third step involves a balancing test, which weighs "the benefits that bargaining will have on the decisionmaking process with the burdens that bargaining imposes on the employer's authority." *Central City*, 149 Ill. 2d at 523, 599 N.E.2d at 905.

¶ 80    The ALJ and IELRB concluded the subject of subcontracting is a mandatory subject of bargaining. The ALJ found the removal or transfer of bargaining unit work affects the wages, hours, and working conditions of the unit; the District's decision to subcontract transportation services is a matter of inherent managerial authority; the issue is amenable to bargaining and AFSCME membership would have benefited from the bargaining; and the benefits of bargaining on the decisionmaking process outweigh any burden imposed on the District's authority. Because the District's decision to subcontract transportation services was a mandatory subject of bargaining, the ALJ found the District was required to maintain the status quo until the parties bargained to impasse or reached agreement on the subject. *McLean County*, 29 PERI ¶ 174, at 883 (ALJ decision). The ALJ found the District failed to maintain the status quo and unilaterally subcontracted out its transportation services, which significantly affected the terms and conditions of employment for AFSCME's members. *Id.* The ALJ also found the District demonstrated it lacked an open mind and a sincere desire to reach an agreement with AFSCME and a disregard of the collective-bargaining process. *Id.* at 884.

¶ 81    "Good faith in the overall bargaining context is assessed upon a review of all of the circumstances. However, the concept is variable and factors which indicate bad-faith bargaining in one circumstance will not be determinative in a different setting." *Service Employees International Local Union No. 316 v. Illinois Educational Labor Relations Board*, 153 Ill. App. 3d 744, 751, 505 N.E.2d 418, 424 (1987). Good-faith bargaining "presupposes an open mind and a sincere desire to reach an ultimate agreement." *Service Employees International Local Union No. 316*, 153 Ill. App. 3d at 751, 505 N.E.2d at 424.

¶ 82    We agree with the ALJ and the IELRB that the District's decision to subcontract the transportation services was a mandatory subject of bargaining under the Act. See *Fibreboard Paper Products Corp. v. National Labor Relations Board*, 379 U.S. 203, 215 (1964) (holding a manufacturer's decision to subcontract maintenance work previously done by union members was a mandatory subject of bargaining); *Service Employees International Local Union No. 316*, 153 Ill. App. 3d at 750, 505 N.E.2d at 423 (stating "[c]ontracting out, hiring of independent contractors to perform work which was formerly bargaining-unit work, is encompassed in the phrase 'terms and conditions of employment' "). However, while the ALJ

cited this court's decision in *Service Employees International Local Union No. 316* in setting forth the law of good faith in the overall bargaining context (*McLean County*, 29 PERI ¶ 174, at 882 (ALJ decision)), the ALJ neglected to cite our standard in the subcontracting context.

> "In the subcontracting context, the requirements for good-faith bargaining on the decision to subcontract are notice of the consideration of a subcontract, before it is finalized; meeting with the union to provide an opportunity to discuss and explain the decision; providing information to the union; and giving consideration to any counterproposals the union makes." *Service Employees International Local Union No. 316*, 153 Ill. App. 3d at 753, 505 N.E.2d at 425.

¶ 83    The evidence in this case is clear that the District complied with the standard for good-faith bargaining in the subcontracting context. In December 2011, Triggs provided notice to AFSCME that the Board of Education was planning to direct the administration to investigate contracting for future student transportation services. *McLean County*, 29 PERI ¶ 174, at 875 (ALJ decision). This notice was given prior to the solicitation of any bids, and notice was given a full seven months before the Board of Education entered into its contract with First Student. The parties discussed the issue at multiple bargaining sessions from December 2011 through June 2012. At its December 14, 2011, meeting, the Board of Education unanimously approved a resolution authorizing the superintendent to solicit bids for transportation services. The resolution expressly stated that one reason the Board of Education was soliciting bids was to "determine any cost savings that may be achieved by contracting with a third party for transportation services." AFSCME was invited to pre-bid conferences and received the same bid documents provided to third-party vendors. AFSCME also received copies of both bids received, along with Bush's memorandum evaluating those bids and the current costs of student transportation. While AFSCME made several proposals after the April 27, 2012, meeting, AFSCME was unwilling to offer a proposal that would compete with First Student.

¶ 84    The evidence indicates the District gave AFSCME notice of its intent to solicit bids for transportation services before it entered into a contract. Further, the District met with AFSCME officials to discuss and explain the decision, responded to AFSCME's information requests, and gave consideration to any of AFSCME's counterproposals. The District even told AFSCME what it needed to do to meet the $1.5 million in savings that would result from subcontracting by stating, as the ALJ found, that the only way AFSCME could possibly compete with First Student was for its membership to accept a wage freeze for two years and to eliminate health insurance benefits.

¶ 85    The ALJ found this to be a close-minded act of bad faith, claiming the District "improperly and unfairly used First Student's bid to gain bargaining power over [AFSCME] and force [AFSCME] to bargain against itself." *McLean County*, 29 PERI ¶ 174, at 884 (ALJ decision). However, the District was not obligated to compromise its position. "In the area of subcontracting, if the employer were required to compromise, the [IELRB] would in effect be determining the substance of the bargaining agreement and the circumstances under which an employer could determine to contract out bargaining-unit work." *Service Employees International Local Union No. 316*, 153 Ill. App. 3d at 754, 505 N.E.2d at 426.

> "Under the Act, in a subcontracting situation, it is not bad faith for either side to refuse to compromise its original position. The duty to bargain in good faith does not require an employer in a subcontracting situation to go above the potential subcontractor's price or to meet the union 'half way.' A subcontractor's bid is a legitimate 'bottom line'

proposal and adherence to it does not mean that the employer had a closed mind or does not sincerely want to reach an agreement. It also does not mean that the employer improperly 'maintained a fixed, unyielding negotiations position' or engaged in bad faith, 'take-it-or-leave-it' bargaining." *Service Employees International Local Union No. 316 & Carbondale Community High School District No. 165*, 2 PERI ¶ 1067, at 183 (IELRB 1986).

The evidence indicates the District bargained in good faith. The District had to act to prepare for the upcoming school year, and its actions failed to rise to the level of an unfair labor practice. Thus, the IELRB's finding that the District violated section 14(a)(5) of the Act is clearly erroneous.

¶ 86                           4. Unfair-Labor-Practice Findings

¶ 87      Because we have found the District did not violate sections 14(a)(1), 14(a)(3), and 14(a)(5) of the Act, the IELRB's decision that the District committed an unfair labor practice when it entered into a subcontract with First Student for student transportation services is clearly erroneous and must be set aside.

¶ 88                                 III. CONCLUSION

¶ 89      For the reasons stated, we reverse the decision of the IELRB, wherein it found the District committed an unfair labor practice when it subcontracted with First Student for transportation services.

¶ 90      Reversed.