NO. 4-24-0860
IN THE APPELLATE COURT
OF ILLINOIS
FOURTH DISTRICT

FILED
July 18, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| HARLEM CONSOLIDATED SCHOOL DISTRICT 122, | ) ) | Direct Review from the Illinois Educational |
| Petitioner, | ) | Labor Relations Board |
| v. | ) | No. 22-CA-0060-C |
| HARLEM FEDERATION OF TEACHERS | ) | |
| LOCAL 540, IFT-AFT, AFL-CIO; THE | ) | |
| ILLINOIS EDUCATIONAL LABOR | ) | |
| RELATIONS BOARD; and LARA SHAYNE, in | ) | |
| Her Official Capacity as Chairperson of the Illinois | ) | |
| Educational Labor Relations Board, | ) | |
| Respondents. | ) | |

JUSTICE DeARMOND delivered the judgment of the court, with opinion.
Justices Knecht and Grischow concurred in the judgment and opinion.

**OPINION**

¶ 1        In April 2022, Harlem Federation of Teachers Local 540, IFT-AFT, AFL-CIO (Union), filed a charge with the Illinois Educational Labor Relations Board (Board) and with Lara Shayne, in her official capacity as chairperson of the Board, against Harlem Consolidated School District 122 (District), alleging an unfair labor practice, namely, twice failing to deduct and remit union dues in contravention of section 11.1 of the Illinois Educational Labor Relations Act (Act) (115 ILCS 5/11.1 (West 2020)). In a hearing before an administrative law judge (ALJ), the parties stipulated to the relevant facts but also presented witnesses who provided undisputed testimony. The ALJ made factual findings and issued a recommended decision and order (RDO),

finding the District violated its statutory obligation to withhold and remit union dues, which amounted to a *per se* violation of the duty to bargain in good faith—an unfair labor practice. The District filed exceptions to the ALJ's RDO, and the Board affirmed. Among other relief, the Board ordered the District to reimburse the Union the amount of dues owed. The District petitioned for direct review by this court, arguing the Board lacked jurisdiction in the matter, the District did not commit an unfair labor practice, and the Illinois Constitution prevents the District from using public funds to pay a private debt. We reverse the Board's decision and remand for further proceedings.

¶ 2                                            I. BACKGROUND

¶ 3                                            A. Stipulated Facts

¶ 4             The parties agreed, and continue to agree, on the material facts in this case. The District is an employer within the meaning of section 2(a) of the Act, and the Union is a labor organization within the meaning of section 2(c) of the Act (115 ILCS 5/2(a), (c) (West 2020)). At all times relevant to this case, the Union and the District have been parties to a collective bargaining agreement (CBA). Per the CBA, the District would deduct union dues from bargaining unit members' paychecks and remit those dues to the Union.

¶ 5             Beginning in the 2019-20 school year, the parties agreed the District would deduct union dues from bargaining unit members' paychecks in 20 of 26 pay periods each school year, up from 15 pay periods in prior years. Each pay period, the bargaining unit members received a pay stub, which showed all withholdings for that pay period, including union dues deductions. For the 2019-20 school year, the District deducted and remitted union dues in 19 pay periods and "neglected to deduct and remit union dues from bargaining unit members' paychecks for the August 14, 2020 pay period." This missed deduction and remittance totaled $23,425.30.

¶ 6        For the 2020-21 school year, the District again deducted and remitted union dues in 19 pay periods and, again, "neglected to deduct and remit union dues from bargaining unit members' paychecks for the August 13, 2021 pay period." This missed deduction totaled $24,480.67, giving the two missed deductions a combined total of $47,905.97. Except for these two pay periods, the District missed no other deductions. It continued deducting and remitting all union dues according to the terms of the CBA.

¶ 7        On October 21, 2021, the Union first informed the District there was a shortfall in their dues to the Illinois Federation of Teachers (IFT).

¶ 8                        B. The Union's Charge and the District's Answer

¶ 9        Citing the missed deductions in August 2020 and August 2021, the Union filed an unfair labor practice charge against the District on April 8, 2022. The Union charged the District "violated section 115 ILCS 5/11.1 of the [Act] indicating that dues need to be withheld as directed and that, 'The failure of an educational employer to comply with the provisions of this Section shall be a violation of the duty to bargain and an unfair labor practice.' " The Union's requested relief included, among other things, the District "pay[ing] [IFT] for the amounts not paid; [and] [m]oving forward, make all deductions as directed."

¶ 10        In its answer, the District denied committing an unfair labor practice and raised the affirmative defense of lack of jurisdiction. To the latter point, the District labeled the Union's charge as untimely filed because the Union knew or should have known of the missed deductions in August 2020 and 2021 because employees receive pay stubs showing all withholdings. The District argued that because the Union did not file the charge within six months of the alleged unfair labor practice, the Board lacked jurisdiction over this matter.

¶ 11                        C. Hearing Before the ALJ

- 3 -

¶ 12 The parties appeared in a hearing before the ALJ on February 8, 2023. In the opening statement, the Union noted the parties agreed on the facts but disagreed on the District's legal liability. The Union argued that section 11.1(f) of the Act (115 ILCS 5/11.1(f) (West 2020)) controlled and compelled a finding the District committed an unfair labor practice. The District countered by arguing it "simply neglected, through a clerical error, to deduct dues from bargaining members' *** pay periods that took place a year apart." It urged such negligence "cannot legally be construed as a repudiation of the bargaining process" or "be construed as a failure of the duty to bargain" under the Act.

¶ 13 After a conference off the record, the parties "agreed to narrow the issue in this charge to whether a violation of Section 11.1(f) of the Act is a strict liability offense under the facts." The Union rested its case-in-chief on the stipulations in the prehearing memorandum, reserving the right to call rebuttal witnesses.

¶ 14 1. *Josh Aurand*

¶ 15 The District called Josh Aurand, who testified he was a District employee, namely, the chief school business official, and he was familiar with the District's payroll procedures. He testified bargaining unit members received a pay stub every pay period, which notified them if union dues had been deducted. He identified a typical pay stub issued to a union member and pinpointed where exactly it documented dues deductions.

¶ 16 Aurand testified the District previously deducted union dues in 15 pay periods, but, per the Union's request, it began withholding union dues in 20 of the 26 pay periods for the 2019-20 school year. The Union requested that "deductions start on the second day in October and go through the end of the year," that is, June 30, 2020. Aurand testified the District deducted

union dues in the first and second pay periods in a given month. If a month had three pay periods, the District did not deduct dues in the third pay period.

¶ 17    Aurand testified the District processed summer payroll differently from non-summer pay periods. He explained the District ran "the last June payments, and then any remaining summer pay all at that time. So, they're processed before the year is over. So, we process those pays that go through the middle of August in June." Aurand noted the District "could be putting together four or five payrolls at once," which could pose challenges, yet the District faced additional challenges in June 2020 because the COVID-19 pandemic caused it to implement "kind of a new process" for payroll. Aurand testified the District followed the same pay schedules for the 2019-20 and 2020-21 school years.

¶ 18    Aurand recalled he learned about the two missed dues deductions during an October 21, 2021, meeting where the Union "had brought up that there was a dues issue[ ] where some dues have been not taken out of their checks." Aurand testified neither he nor anyone else in the District knew of the missed deductions until that meeting. He testified, "It was, ultimately, determined that the District neglected to deduct the dues on two pay periods" a year apart in August 2020 and 2021. Aurand testified the District did not intentionally fail to deduct union dues during those two pay periods. He identified a "clerical error in the payroll department" as the reason for the missed deductions. Aurand confirmed the District missed no other deductions and has continued making the required deductions.

¶ 19    On cross-examination, Aurand testified the District could have made the appropriate deductions for staff members still employed at the District when it first learned of the two missed deductions. He went on to say that "would have been our preferred method" for resolving the problem. Aurand clarified it was "absolutely" possible to make the deductions once

the Union informed the District of the missed deductions, and as was revealed on redirect examination, the offer was made by the District upon being advised of the error—and refused by the Union.

¶ 20                                    2. *Leah Krippner*

¶ 21            As part of their case in rebuttal, the Union called Leah Krippner to testify. She stated she was employed by the District as the high school librarian. Krippner confirmed she was the first vice president of the Union and the vice president of IFT. She testified she worked with Aurand in trying to resolve the dues shortfall, estimating they met 8 to 10 times. She explained neither she nor Aurand "could pinpoint what the problem was," elaborating, "We just knew that IFT was looking for a lot of money from the [Union], and *** our local had previously had no hand in tracking the finances." Krippner noted the dues deduction-remittance process "happened seamlessly in the past." She testified the Union finally found the shortfall when two members took a day off work on November 29, 2021, "and combed through the books."

¶ 22            Krippner testified the Union and the District "talked about different ways that we could resolve" the shortfall. She noted, "All of them seemed to be unfair to those of us who remained loyal to the District, and were basically punishing us for staying, and hurting those of us who had [not] opted to leave the district or leave the Union." Krippner confirmed the parties could not agree on a resolution. Krippner testified to the Union's reasoning for rejecting the District's offers, saying, "[W]e hadn't messed anything up, and people had kind of spent their money, and now it was going to, particularly for our low-end employees, this was going to be kind of a shocker to have money that you were counting on being there suddenly gone."

¶ 23            On cross-examination, Krippner testified she received an electronic pay stub every pay period, noting, "I open it sometimes, and sometimes I don't." She affirmed she was

aware the pay stub shows when union dues are deducted from her paycheck. She further confirmed she was aware dues are deducted from 20 paychecks per year. She and the Union opposed deducting the missing dues now "because for most people who are at the low income bracket, taking out of your third check is kind of a gouge because you were counting on that money." However, Krippner acknowledged union members received more money than they were owed when the District missed the deductions in August 2020 and 2021. She conceded that under the District's proposed resolution, "employees would have, ultimately, received the same amount of money, in total overall."

¶ 24        The parties submitted their CBA as a joint exhibit, and the District submitted a pay stub as an exhibit. The sample pay stub showed the dues deduction for a 2023 pay period was $36. The ALJ took the matter under advisement and set the timeline for posthearing briefing.

¶ 25                                D. The ALJ's RDO

¶ 26        On October 25, 2023, the ALJ issued a written RDO, outlining his factual findings and legal conclusions. The ALJ phrased the issue as whether "the District's failure to deduct dues from the August 14, 2020 and August 13, 2021 paychecks is a violation of the duty to bargain in good faith pursuant to Section 11.1(f) of the Act." The ALJ discussed section 11.1(f)'s origins and determined: "It is clear from the plain text of Section 11.1 that the legislature intended to make a failure to deduct and remit dues a strict liability offense, and equally clear that the legislature's intended remedy is that the employer reimburse the union." The ALJ considered and rejected the District's three defenses, specifically, (1) the Union's charge was untimely, (2) it did not bargain in bad faith, and (3) it cannot reimburse union dues with public funds.

¶ 27        Considering the stipulated facts, along with the testimony from Aurand and Krippner, the ALJ concluded "the District's failure to withhold and remit dues from employee paychecks on August 14, 2020, and August 13, 2021 was in contravention of Section 11.1(a) and (b) of the [Act]." Going further, the ALJ deemed the District's violation a "*per se* \*\*\* violation of the duty to bargain in good faith and, accordingly, a violation of Section 14(a)(5) and, derivatively, (1) of the Act." The ALJ ordered the District to reimburse the Union in the amount of $47,905.97. The District filed exceptions to the ALJ's RDO, bringing it before the Board.

¶ 28                     E. The Board's Opinion and Order

¶ 29        In its review, the Board adopted the ALJ's factual findings, observing the ALJ heard "undisputed testimony." Rejecting the District's jurisdiction argument, the Board concluded it had jurisdiction to decide the matter because the Union timely filed the charge upon learning of the missed dues deductions. It found "the record indicates the Union's earliest knowledge of the dues shortfall as October 21, 2021, when the Union brought it up to the District, less than six months before the charge was filed." The Board determined "the Union knew or should have known of the alleged misconduct on October 21, 2021 and it had actual knowledge on November 29, 2021." Having settled the jurisdiction exception, the Board turned to the District's next exception, the meaning of section 11.1 of the Act.

¶ 30        The Board observed, "Section 11.1 is a somewhat recent amendment to the [Act], thus this unfair labor practice charge arising in its context is a matter of first impression." The Board found "the plain meaning of the statute indicates that the legislature meant to make an educational employer's failure to collect and remit union dues a violation of that employer's duty to bargain and an unfair labor practice." The Board, however, recognized the new section 11.1(f) (115 ILCS 5/11.1(f) (West 2020)) did "not create a stand-alone unfair labor practice." It must be

- 8 -

considered in view of section 14 of the Act, which governs unfair labor practices (115 ILCS 5/14(a) (West 2020)).

¶ 31        Like the ALJ, the Board rejected the District's argument that the Union must show the District acted with a bad motive or antiunion animus when it failed to deduct and remit union dues. However, unlike the ALJ, the Board refused to couch its decision in strict liability terms, noting:

> "While we may not characterize the General Assembly's intent to make a violation of Section 11.1 a strict liability offense, the General Assembly included nothing to indicate that an educational employer's motive behind its failure to deduct and remit dues to the union is relevant in determining if it failed to comply with Section 11.1."

Accordingly, the Board rejected from consideration any reasons or explanations for the missed deductions and ultimately determined "the plain meaning of Section 11.1 indicates that the legislature meant to make an educational employer's failure to collect and remit union dues a violation of that employer's duty to bargain and, as a result, an unfair labor practice within the meaning of Section 14(a)(5) of the Act."

¶ 32        Finally, the Board rejected the District's argument that the ALJ's proposed remedy—the District reimbursing the Union—violated the Illinois Constitution because it required using public funds to discharge a private debt. Without examining the Illinois Constitution or considering any relevant case law, the Board simply found "the plain meaning of the statute controls." Because section 11.1(f) provided, "Relief for the violation shall be reimbursement by the educational employer of dues that should have been deducted or paid

based on a valid authorization given by the educational employee or employees," the Board found no other inquiry was necessary. It affirmed the ALJ's RDO and ordered the same relief.

¶ 33        This appeal followed.

¶ 34                                II. ANALYSIS

¶ 35        The District challenges the Board's order, raising several arguments that we condense into three: (1) the Board did not have jurisdiction over the Union's unfair labor practice charge because it was untimely, (2) the Board erroneously found the District committed an unfair labor practice because it improperly construed section 11.1(f) of the Act without reference to section 14(a)(5) by finding motive irrelevant, and (3) the Board issued an unlawful remedy because Illinois law prohibits the District from paying a private debt with public funds.

¶ 36                             A. Standards of Review

¶ 37        Our review of a decision by the Board "is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 1994)) and extends to all issues of law and fact presented by the record." *Speed District 802 v. Warning*, 242 Ill. 2d 92, 111 (2011). We deem the Board's factual findings "*prima facie* correct unless they are against the manifest weight of the evidence." (Emphasis omitted.) *Speed District 802*, 242 Ill. 2d at 111-12. By contrast, we review all legal questions *de novo*, giving no deference to the Board. *Speed District 802*, 242 Ill. 2d at 111. If the Board decides a mixed question of law and fact, we apply the clearly erroneous standard. *Speed District 802*, 242 Ill. 2d at 112. We will find the Board's decision clearly erroneous only when, looking at the entire record, we are "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Board of Trustees of the University of Illinois v. Illinois Labor Relations Board*, 224 Ill. 2d 88, 97-98 (2007). "While this standard is highly deferential, it does not relegate judicial review to mere

- 10 -

blind deference of [the Board's] order." *Board of Trustees of the University of Illinois*, 224 Ill. 2d at 98.

¶ 38                                    B. Jurisdiction

¶ 39          Section 15 of the Act provides, "No order shall be issued upon an unfair practice occurring more than 6 months before the filing of the charge alleging the unfair labor practice." 115 ILCS 5/15 (West 2020). We have held section 15's six-month time frame imposes a jurisdictional restriction on the Board, meaning the Board has no power to act on a charge brought outside the six-month limitations period. *Charleston Community Unit School District No. 1 v. Illinois Educational Labor Relations Board*, 203 Ill. App. 3d 619, 625 (1990); *Ferrari v. Department of Human Rights*, 351 Ill. App. 3d 1099, 1103 (2004) (explaining an administrative body's power arises solely from statute, and it can only exercise the authority given to it by the legislature). Section 15's "six-month filing period begins to run when the charging party became aware (or should have become aware) of the actions which allegedly constitute a violation of the [Act]." (Internal quotation marks omitted.) *Jones v. Illinois Educational Labor Relations Board*, 272 Ill. App. 3d 612, 620 (1995).

¶ 40          The District raised lack of jurisdiction as an affirmative defense, so it bore the burden of proving the Union's charge was untimely. See *Brooks v. McLean County Unit District No. 5*, 2014 IL App (4th) 130503, ¶ 31. The District, therefore, had to prove the Union knew or should have known of the missed deductions more than six months before it filed the unfair-labor-practice charge on April 8, 2022. See *Jones*, 272 Ill. App. 3d at 620. Put differently, the District had to show the Union knew or should have known of the alleged unfair labor practice *before* October 8, 2021. On the record before the Board, the District failed to carry this burden.

¶ 41    The parties stipulated the Union first informed the District of a shortfall in their dues "on or around October 21, 2021." Aurand testified similarly, confirming he—and the District—first learned of a shortfall in Union dues at the October 21, 2021, meeting between the parties. Krippner testified the Union pinpointed the precise reason for the deficit, the two missed deductions in August 2020 and 2021, on November 29, 2021. Presented with these undisputed facts, the Board determined the Union should have known of the alleged unfair labor practice on October 21, 2021, and had "actual knowledge" of it on November 29, 2021—both dates falling within the six-month jurisdictional time limit to file a charge.

¶ 42    Before both the ALJ and the Board, and now to this court, the District has maintained the Union should have known of the missed deductions in August 2020 and 2021. It places the full weight of this argument on employee pay stubs. The parties stipulated that every pay period, employees receive a pay stub identifying all deductions and withholdings, including union dues. Despite this stipulation, the District also presented a comparable union employee's pay stub and had Aurand point out where it showed union dues deduction. The District also elicited testimony from Krippner that she received a pay stub every pay period, she did not always look at her pay stub, and the pay stubs showed union dues deductions. From this evidence, the District asked the ALJ, the Board, and now this court to infer the Union should have known of the missed deductions when employees received their pay stubs on August 14, 2020, and August 13, 2021. To be sure, inferring the Union should have known of the missed deductions on these dates unquestionably places the Union's unfair labor practice charge outside the six-month filing window. The Board, however, did not make such an inference, and in light of the entire record, we cannot conclude it clearly erred in not doing so.

¶ 43 Besides establishing union employees received pay stubs that showed all withholdings every pay period, the record also established the District and Union began a new payment schedule for the 2019-20 school year. The District began withholding union dues in 20 pay periods rather than in 15 pay periods, as it had done in prior years. For the first time, dues deductions extended into the summer months. The missed deductions would have been the twentieth and final deductions for the school year. At oral argument, the District's counsel maintained a payment schedule existed for the 2019-20 school year that showed when dues would be deducted, but it is not in the record. There is nothing to indicate the employees knew the dues deduction schedule or were expressly informed of how the change in deductions would affect them. The District based its jurisdiction argument solely on pay stubs. It presented no evidence showing the procedures for remitting dues to the Union. Again, at oral argument, counsel claimed the District remitted dues within 10 days of deducting them from employee paychecks, yet the District had submitted no evidence to support the claim. To be sure, the record is silent on how and when remittance occurs to the Union, so one could not infer when the Union should have known of the missed deductions. Interestingly, Krippner testified the local union authorities "had previously had no hand in tracking the finances," but local union leaders only learned of the shortfall when IFT told them. The District has not challenged this testimony. The IFT is also a party to this suit, but, again, there is no evidence establishing how it would or should know dues were missing. That would have been the District's burden below.

¶ 44 Ultimately, the Board found the Union first became aware, or should have been aware, of a dues shortfall on October 21, 2021. There is no evidence directly contradicting that finding, so we deem it *prima facie* correct. *Speed District 802*, 242 Ill. 2d at 111-12. There is merely an invited inference that an employee could or should have known earlier by looking at a

pay stub and could or should have known, for the first time, that dues deductions extended through August. Because the Board found the Union filed its charge within the six-month limitations period in section 15 (115 ILCS 5/15 (West 2020)), it concluded it had jurisdiction to hear and act on this matter. Considering the entire record, we cannot say the Board's conclusion is clearly erroneous—we are not left with the firm and definite conviction a mistake has been made. *Board of Trustees of the University of Illinois*, 224 Ill. 2d at 97-98.

¶ 45    The District directs our attention to this court's opinion in *Wapella Education Ass'n v. Illinois Educational Labor Relations Board*, 177 Ill. App. 3d 153, 168 (1988), where we said, "[T]he proper focus is on the time of the discriminatory act and not the point at which the consequences of the act become most painful." In deciding when the Union knew or should have known of the missed deductions, the District asks us to focus on when the dues were missed and not when the Union felt the pain of a shortfall in union dues. If we focused solely on when the omission occurred, then the Union's charge would be untimely. But we do not find *Wapella* controlling, or even compelling, here. First, we note the District conveniently quotes only part of *Wapella*'s principle. The court fully noted, "While the proper focus is on the time of the discriminatory act and not the point at which the consequences of the act become most painful [citations], *one must also consider the nature of the discriminatory act*." (Emphasis added.) *Wapella*, 177 Ill. App. 3d at 168. Second, considering the nature of the act here, the facts are totally different, making that particular legal principle ineffective here. There, we had to determine when the six-month jurisdictional limitation in section 15 of the Act began to run. Specifically, we had to decide when the union knew or should have known of a unilateral action by the school district—when the action was announced or when it was implemented. *Wapella*, 177 Ill. App. 3d at 159. This court held the union knew or should have known of the unilateral

- 14 -

action when it was announced. *Wapella*, 177 Ill. App. 3d at 168. Here, the District neither announced nor implemented any unilateral change to the dues deduction process to put the Union on notice. The parties stipulated the two missed deductions amounted to negligence the District did not know about until months afterwards. Moreover, unlike *Wapella*, where the record was replete with evidence the union knew or should have known about the unilateral action, there is little evidence here showing when the Union knew about a dues shortfall. For these reasons, we find *Wapella* unavailing here.

¶ 46                                            C. Section 11.1(f) of the Act

¶ 47        This case turns upon the meaning of section 11.1(f) of the Act (115 ILCS 5/11.1(f) (West 2020)), a novel question from a fairly new addition to the Act. The Board rightly observed, "[T]his unfair labor practice charge arising in its context is a matter of first impression." Specific to these facts, we must consider, does section 11.1(f) cover the District's conduct of twice neglecting to withhold and remit union dues? In more general terms, is an employer's motive a factor when determining if it violated section 11.1(f), and how does any of that fit within the framework of unfair labor practices? As we will explain below, we hold section 11.1(f) is distinct from other subsections in section 11.1 because it is uniquely tethered to section 14(a)(5) (115 ILCS 5/14(a)(5) (West 2020)), which governs unfair labor practices where good faith is paramount; consequently, motive is a relevant factor for consideration when presented with an unfair-labor-practice charge under section 11.1(f).

¶ 48        The meaning of a statute presents a purely legal question we review *de novo*; thus, our "review is independent and not deferential." *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). Our "primary objective in construing a statute is to ascertain and give effect to the intention of the legislature." *Chicago Teachers Union, Local*

*No. 1 v. Board of Education of Chicago*, 2012 IL 112566, ¶ 15. "The most reliable means of achieving that goal is to apply the plain and ordinary meaning of the statutory language." *Bowman v. Ottney*, 2015 IL 119000, ¶ 9. Indeed, the specific words the legislature chose to use are the best evidence of legislative intent. *Kloeppel v. Champaign County Board*, 2021 IL App (4th) 210091, ¶ 15. But we are careful not to isolate words; we still "view the statute as a whole, construing words and phrases in light of other relevant statutory provisions." *Bowman*, 2015 IL 119000, ¶ 9; see *Cinkus*, 228 Ill. 2d at 216-17 ("The statute should be evaluated as a whole, with each provision construed in connection with every other section."). Our supreme court "has previously held that sections of the same statute should be considered so that each section can be construed with every other part or section of the statute to produce a harmonious whole." *Board of Education of Chicago v. Moore*, 2021 IL 125785, ¶ 40 (citing *Land v. Board of Education of Chicago*, 202 Ill. 2d 414, 422 (2002)). With these principles in mind, we turn to the disputed statute, section 11.1(f) of the Act (115 ILCS 5/11.1(f) (West 2020)).

¶ 49        Section 11.1(f) provides:

> "The failure of an educational employer to comply with the provisions of this
> Section shall be a violation of the duty to bargain and an unfair labor practice.
> Relief for the violation shall be reimbursement by the educational employer of
> dues that should have been deducted or paid based on a valid authorization given
> by the educational employee or employees. In addition, the provisions of a
> collective bargaining agreement that contain the obligations set forth in this
> Section may be enforced in accordance with Section 10." 115 ILCS 5/11.1(f)
> (West 2020).

The parties spar over what this means and how it fits into the broader context of unfair labor practices, particularly whether, as part of proving an unfair-labor-practice charge, the charging party must show an employer acted in bad faith when failing to comply with section 11.1 (115 ILCS 5/11.1 (West 2020)). In other words, they debate whether an employer's motive in failing to comply with section 11.1 is relevant to determining whether it violated the duty to bargain in good faith and committed an unfair labor practice. The District insists motive matters, and the Board counters it does not. Below, the Board concluded, "[T]he General Assembly included nothing to indicate that an educational employer's motive behind its failure to deduct and remit dues to the union is relevant in determining if it failed to comply with Section 11.1." In arriving at that conclusion, the Board emphasized the "plain meaning" of the statute, presumably the mandatory meaning of the word "shall." We agree the statute's plain and ordinary meaning controls, but we do not arrive at the same conclusion as the Board. Considering section 11.1(f) within the context of section 11.1 as a whole, and then considering section 11.1 within the larger context of the entire Act, we hold section 11.1(f)'s plain meaning makes motive relevant in determining if an employer failed to comply with section 11.1.

¶ 50        The General Assembly enacted section 11.1 of the Act in 2019, and it became effective on December 20, 2019. Pub. Act 101-620 (eff. Dec. 20, 2019) (adding 115 ILCS 5/11.1). On the whole, the Act "regulate[s] labor relations between educational employers and educational employees" (115 ILCS 5/1 (West 2020)), and the newly added section 11.1 of the Act governs "dues collection" by setting out procedures for deducting and remitting union dues by making employers the middleman in that process. To that end, subsection (a) provides that educational employers "shall make payroll deductions of employee organization dues *** for an employee organization that is the exclusive representative," and it mandates "[s]uch deductions

- 17 -

shall be made in accordance with the terms of an employee's written authorization and shall be paid to the exclusive representative." 115 ILCS 5/11.1(a) (West 2020).

¶ 51         We observe section 11.1 does not micromanage this process. It says little about when and how an employer deducts and remits union dues. Instead, it offers parties latitude to bargain about how the process plays out under a particular CBA, setting only the outer parameters for different timelines. For example, subsection (b) requires that "[u]pon receiving written notice of the authorization, the educational employer must commence dues deductions as soon as practicable, but in no case later than 30 days after receiving notice from the employee organization." 115 ILCS 5/11.1(b) (West 2020). In the same vein, "Employee deductions shall be transmitted to the employee organization no later than 10 days after they are deducted unless a shorter period is mutually agreed to." 115 ILCS 5/11.1(b) (West 2020). Subsection (c) mandates that once an employer begins withholding and remitting union dues for an employee, the employer must continue to do so until it receives proper notice the employee revoked the authorization, or the employee is no longer employed by the employer. 115 ILCS 5/11.1(c)(1)-(2) (West 2020).

¶ 52         Other subsections in section 11.1 govern how information is shared between employees, employers, and the union. See 115 ILCS 5/11.1(d)-(e) (West 2020) (providing employees should direct authorizations, cancellations, changes in authorizations, or revocations of authorizations to the union, who would then relay that information to the employer). Those subsections require a union to indemnify an employer if it provides an employer with inaccurate information, the employer relies on that information in good faith, and a claim against the employer arises. See 115 ILCS 5/11.1(d)-(e) (West 2020). We notice again section 11.1 does not

- 18 -

control how information is shared, when it is shared, or how and when unions indemnify employers.

¶ 53 We understand the newly enacted section 11.1(f) to implement and govern basic standards and processes for dues collection. This is the simple framework in which subsection (f) exists and the context in which we must read it. As we noted (*supra* ¶ 49), section 11.1(f) states, "The failure of an educational employer to comply with the provisions of this Section shall be a violation of the duty to bargain and an unfair labor practice." 115 ILCS 5/11.1(f) (West 2020). The Board relied (and continues to rely) on section 11.1(f)'s plain language, maintaining the statute "does not mention motive or assign any significance to the employer intent." It, therefore, reasons "the employer's motive is irrelevant under the plain language of section 11.1(f)." We disagree.

¶ 54 Looking at the language, right away, we observe the statute invokes the terms "duty to bargain" and "unfair labor practice"—terms defined and linked within the Act. This is important for two reasons. One, these are terms within labor law unquestionably tied to the motive of the parties since they regularly form the basis of most labor litigation. Two, these terms necessarily link section 11.1(f) to other sections in the Act where motive matters.

¶ 55 Section 10(a) of the Act imposes the duty to bargain. See 115 ILCS 5/10(a) (West 2020). It reads: "Collective bargaining is the performance of the mutual obligations of the educational employer and the [union] to meet at reasonable times and confer *in good faith* with respect to wages, hours and other terms and conditions of employment ***." (Emphasis added.) 115 ILCS 5/10(a) (West 2020). Section 10(a) certainly makes good faith (or motive) relevant to the duty to bargain.

¶ 56 Section 10(c) requires that a CBA negotiated by educational employers and

employees must include "a grievance resolution procedure *** and shall provide for binding arbitration of disputes concerning the administration or interpretation of the agreement." 115 ILCS 5/10(c) (West 2020). The nature of the grievance-arbitration process, where alleged violations need to be adjudicated by an independent arbiter, seems inconsistent with *per se* or strict liability offenses. Section 11.1(f) references section 10(c) by making the grievance-arbitration process in a CBA a possible avenue for relief for a violation of section 11.1(f). This reference further suggests section 11.1(f) involves good faith (or motive).

¶ 57        The term "unfair labor practice" also appears throughout the Act. It is defined in section 2(h) as "any practice prohibited by Section 14 of this Act." 115 ILCS 5/2(h) (West 2020). Section 14, in turn, lists various unfair labor practices, including the one charged here: "*Refusing to bargain collectively in good faith* with [a union] which is the exclusive representative of employees in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative." (Emphases added.) 115 ILCS 5/14(a)(5) (West 2020). Section 14(a)(5)'s plain language most assuredly makes motive relevant for the unfair labor practice because good faith is a required element. The Board's brief, citing *Speed District 802*, 242 Ill. 2d at 113, acknowledged as much, noting "*an employer's motive is often relevant to deciding whether it committed an unfair labor practice.*" (Emphasis added.) Looking at the specific words and references the legislature chose to use in section 11.1(f), words infused with motive, we find the legislature intended for motive to play a part in considering an unfair labor practice under the statute. See *Kloeppel*, 2021 IL App (4th) 210091, ¶ 15 (stating the specific words used are the best evidence of legislative intent).

¶ 58        Reading section 11.1(f)'s plain language to contemplate an employer's motive brings cohesion to the Act—it allows section 11.1(f) and section 14(a)(5) to work together

- 20 -

seamlessly. By using "duty to bargain" and "unfair labor practice," section 11.1(f) necessarily ties a violation of section 11.1 to section 14(a)(5) of the Act. The parties agree on this point. Indeed, the Board acknowledged that "[s]ection 11.1(f) does not create a stand-alone unfair labor practice." So, since sections 11.1(f) and 14(a)(5) both address a claimed unfair labor practice relating to the duty to bargain, we must consider them together and give them harmonious effect. See *Land*, 202 Ill. 2d at 422. It is well-established law that motive or good faith is relevant in evaluating an unfair-labor-practice charge brought under section 14(a)(5). See *Community Unit School District No. 5 v. Illinois Educational Labor Relations Board*, 2014 IL App (4th) 130294, ¶¶ 81-85; *Service Employees International Local Union No. 316 v. Illinois Educational Labor Relations Board*, 153 Ill. App. 3d 744, 750-53 (1987). We presume the legislature had section 14(a)(5) and its motive requirements in mind when it enacted section 11.1(f) because the statutes relate to the same subject matter. *People v. Burge*, 2021 IL 125642, ¶ 31. Moreover, we presume the legislature expected the statutes to be construed together. *Burge*, 2021 IL 125642, ¶ 31.

¶ 59            Ultimately, it stands to reason that if the legislature expressly linked section 11.1(f) to section 14(a) through motive language like "duty to bargain" and "unfair labor practice" and references to an additional optional grievance-arbitration procedure, then motive must be just as relevant to section 11.1(f) as it is to sections 10 and 14(a)(5). We, therefore, reject the Board's determination that section 11.1(f) contains "nothing to indicate that an educational employer's motive behind its failure to deduct and remit dues to the union is relevant in determining if it failed to comply with Section 11.1."

¶ 60            To support its position that motive is irrelevant to these allegations, the Board argues "any language regarding motive is absent from section 11.1" on the whole. The Board identifies as examples section 11.1(d) and (e) of the Act (115 ILCS 5/11.1(d)-(e) (West 2020)).

These sections require the union to indemnify an employer for damages or reasonable costs when the union mistakenly gives the employer faulty information about employee dues authorizations, changes, or revocations, the employer relies on the information, and as a result, an employee files a claim against the employer. The Board argues these subsections "assign[ ] no significance to the union's lack of intent to mislead the employer" and require indemnification "without regard to the union's motive." Simply put, the union must indemnify the employer regardless of motive. We may well agree with the Board's view on sections 11.1(d) and (e). However, this argument does not strengthen the Board's conclusion about section 11.1(f). Instead, it weakens it. Unlike in section 11.1(f), the legislature did not specify the act or omission by the union would be an unfair labor practice under section 11.1(d) and (e). This omission makes section 11.1(d) and (e) vastly different from section 11.1(f). As a result, they are not linked to either section 10 or section 14(a)(5) of the Act. We must presume this omission was intentional. *People v. Edwards*, 2012 IL 111711, ¶ 27 ("Where language is included in one section of a statute but omitted in another section of the same statute, we presume the legislature acted intentionally and purposely in the inclusion or exclusion."). There must be significance in including "duty to bargain" and "unfair labor practice" in section 11.1(f) but not in section 11.1(d) or (e). Why? Because the failure to comply under section 11.1(f), an affirmative failure to comply by the employer, needs to be evaluated further to determine whether it was intentional and possibly an unfair labor practice, or something else—like a mistake. The different wording signals the legislature wanted the conduct to be evaluated, classified, and treated differently. It is reasonable to find the legislature intended motive to factor into section 11.1(f), where the failure to comply immediately invokes "duty to bargain" and "unfair labor practice" language, but not in section 11.1(d) and (e), where it does not invoke those terms.

¶ 61         The Board presumably bases its plain meaning evaluation of section 11.1(f) on the use of "shall" as mandatory—"failure of an educational employer to comply with the provisions of this Section *shall* be a violation of the duty to bargain and an unfair labor practice." (Emphasis added.) 115 ILCS 5/11.1(f) (West 2020). The Board's view is not unfounded because "[g]enerally, 'shall' indicates a mandatory intent" from the legislature. *Emerald Casino, Inc. v. Illinois Gaming Board*, 346 Ill. App. 3d 18, 27 (2003). But "shall" can also indicate a directory intent from the legislature. *Brennan v. Illinois State Board of Elections*, 336 Ill. App. 3d 749, 759 (2002); see *Emerald Casino, Inc.*, 346 Ill. App. 3d at 27 (stating courts sometimes interpret "shall" as directory). "The legislative intent [for 'shall'] can be ascertained from a consideration of the entire Act, its nature, its purpose, and the consequences that would result from interpreting the provision a specific way." *Brennan*, 336 Ill. App. 3d at 759. Considering section 11.1 within the entire Act, we find 11.1(f)'s use of "shall" to be directory, not mandatory.

¶ 62         As we have noted, section 11.1(f) is expressly linked to sections 10 and 14(a)(5) of the Act. However, reading "shall" as mandatory in section 11.1(f) divorces it from those provisions because that interpretation removes motive or good faith from duty to bargain or an unfair labor practice. This reading allowed the ALJ to conclude section 11.1(f) created a strict liability offense and a *per se* violation of the duty to bargain. The Board affirmed this conclusion, although it did not use the terms "strict liability" or "*per se*." But this cannot be what the legislature intended.

¶ 63         To reach this conclusion, one must isolate section 11.1(f) from the rest of the Act and read it without reference to any other statutory provisions. We are not to read words, or even statutory sections, in isolation (see *Bowman*, 2015 IL 119000, ¶ 9); rather, we must look at the whole statute "so that each section can be construed with every other part or section of the statute

- 23 -

to produce a harmonious whole." *Moore*, 2021 IL 125785, ¶ 40. Reading 11.1(f) in isolation and treating it as a *per se* unfair labor practice where motive is irrelevant would not bring harmony to the Act. On the contrary, it would make 11.1(f) an anomaly within the Act. The Board does not cite, and we did not find, another section in the Act where noncompliance amounts to a *per se* violation of the duty to bargain or a *per se* unfair labor practice by any party. We are aware of one general category where Illinois labor case law speaks of *per se* violations—"An educational employer's unilateral change with respect to a mandatory subject of bargaining constitutes a *per se* violation of the duty to bargain, without regard to consideration for good or bad faith." *Georgetown-Ridge Farm Community Unit School District No. 4 v. Illinois Educational Labor Relations Board*, 239 Ill. App. 3d 428, 450 (1992) (citing *Georgetown-Ridge Farm Community Unit School District 4*, 7 PERI ¶ 1045 (IELRB 1991)). The Union agreed the District twice "neglected" to deduct and remit dues; it has never alleged the District implemented a unilateral change to the process of dues collection under the CBA.

¶ 64        We conclude interpreting "shall" as mandatory in section 11.1(f) would make it unlike any other claimed violation in section 11.1 or elsewhere in the Act. Further, it would be unlike any other *per se* offense in the labor case law. We cannot conclude the legislature intended such a result with a mandatory rendering of "shall." Under the Act, the nature of a violation of the duty to bargain and an unfair labor practice involves motive. The overall purpose of section 11.1(f) is to make dues collection subject to the duty to bargain and set basic standards and processes for parties to follow. It does not contemplate random *per se* violations for mistakes where an employer neglects to deduct and remit union dues. Critically, the consequences of reading "shall" as mandatory would isolate section 11.1(f) from the Act and render it an anomaly. Considering the entire Act, we do not believe "shall" eliminates the good-faith element

implicit in the duty to bargain and the attendant unfair labor practice. See *Brennan*, 336 Ill. App. 3d at 759. Within this specific context—section 11.1(f) outlining a violation that must be evaluated under section 14(a)(5)—we understand "shall" to be directory and not mandatory. See *Emerald Casino, Inc.*, 346 Ill. App. 3d at 27 (stating courts sometimes interpret "shall" as directory). In other words, "shall" acts to direct parties to section 14(a)(5) to resolve claims arising out of section 11.1(f).

¶ 65    We hold section 11.1(f) of the Act is distinct from other subsections in section 11.1 and the only one connected to sections 10 and 14(a) of the Act; therefore, section 11.1(f) makes motive relevant when determining if an employer's failure to comply with section 11.1 constitutes a violation of the duty to bargain and an unfair labor practice. Section 11.1(f) does not create a strict liability offense, nor does it create a *per se* violation of the duty to bargain. The former term is ill-suited to labor law, and the latter term is a principle applied in only exceptional circumstances because an employer's motive must be considered when a union levies an unfair-labor-practice charge.

¶ 66    Matters of motive and good faith in the labor context are factual questions requiring " 'a review of all of the circumstances.' " *Community Unit School District No. 5*, 2014 IL App (4th) 130294, ¶ 81 (quoting *Service Employees International Local Union No. 316*, 153 Ill. App. 3d at 751). What is bad faith in one circumstance may not be bad faith in another situation given the totality of the circumstances. *Community Unit School District No. 5*, 2014 IL App (4th) 130294, ¶ 81. Because motive is a fact question relevant in determining whether an employer violated the duty to bargain and committed an unfair labor practice under section 11.1(f), we remand this matter to the Board for further proceedings consistent with the order. Given our remand, being mindful of the doctrine of constitutional avoidance and wary of

treading on topics that may become moot or advisory, we reserve for another day the question of whether the Illinois Constitution allows the Board to order the District to pay a private debt with public funds. See *Schwartz v. Illinois Human Rights Comm'n*, 2024 IL App (4th) 231248, ¶ 99 (reciting our supreme court's well-established rule, "cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort" (internal quotation marks omitted)); *Peach v. McGovern*, 2019 IL 123156, ¶ 64 ("Courts of review will not decide moot or abstract questions, will not review cases merely to establish precedent, and will not render advisory opinions.").

¶ 67                                  III. CONCLUSION

¶ 68        For the reasons stated, we reverse the Board's judgment. We remand for proceedings consistent with this opinion.

¶ 69        Reversed and remanded.

*Harlem Consolidated School District 122 v. Harlem Federation of Teachers Local 540*,
**2025 IL App (4th) 240860**

| | |
|---|---|
| **Decision Under Review:** | Petition for review of order of Illinois Educational Labor Relations Board, No. 22-CA-0060-C. |
| **Attorneys for Appellant:** | Christopher L. Petrarca, William F. Gleason, and Eric B. Bernard, of Petrarca, Gleason, Boyle & Izzo, LLC, of Oak Brook, for petitioner. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Valerie Quinn, Assistant Attorney General, of counsel), for respondent Illinois Educational Labor Relations Board.<br><br>No brief filed for other respondents. |